IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
(Harrisonburg Division)

**BRYCE GERALD RANDALL NOWLAN** *

    **Petitioner,** *

**v.** *

    Civil No.: 5:20-cv-00102-TTC

**NINA LYNN NOWLAN** *
**(f/k/a Nina Lynn Brown)**

    *

    **Respondent.**

    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PETITIONER'S MOTION *IN LIMINE*
(TO EXCLUDE PROPOSED EXPERT WITNESS
AND *DE BENE ESSE* TESTIMONY OF LAURIE THOMAS, LCSW-C)[1]**

Petitioner, Bryce Gerald Randall Nowlan (the "Father"), by and through his undersigned attorneys, files this Motion *in Limine* to exclude Respondent's proposed expert witness, Laurie Thomas, LCSW-C, and her *de bene esse* testimony ("Motion *in Limine*"), and states as follows:

## I. INTRODUCTION

1. The Father requests that this Court exclude the Mother's proposed expert, Laurie Thomas, LCSW-C ("Ms. Thomas") from testifying via her *de bene esse* testimony at the evidentiary hearing set for January 28-29, 2021.

2. Ms. Thomas' opinions fail the *Daubert* standard for scientific relevancy and reliability. They are not based on any coherent or generally accepted scientific methodology or principles.

---

[1] The Court has indicated that it may hold any *in limine* request such as this motion until after the testimony of the witness, given the expedited nature of these treaty cases.

1

3. First, Ms. Thomas must be qualified.[2] If she were to be deemed qualified, then this Court must determine if her opinions are reliable and relevant. To assess reliability, the Court should look at the non-exhaustive factors set forth in *Daubert* and the factors that have been used by courts time and again to exclude (or allow) expert testimony. If Ms. Thomas' opinions are deemed reliable, then this Court must determine if the testimony is relevant—if it will assist this Court as the trier of fact. None of the elements for admissibility are met here.

4. In summary:

    A. Ms. Thomas' subjective opinions lack any framework or methodology.

    B. She unjustifiably extrapolates from her accepted premise to an unfounded conclusion.

    C. Her subjective opinions are not based on solid factual foundation.

    D. Her subjective opinions utterly fail to consider differential diagnoses or alternative explanations.

    E. Her opinions are her subjective conclusions, which are not based on any peer review literature, any set of professional guidelines or the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5").

    F. She takes at face value a four-year-old child's self-reporting, along with the Mother's self-serving reporting, without any checks and balances or collateral information.

    G. She misunderstands that her role as the child's treating play therapist is not that of a forensic evaluator. And she is not a forensic evaluator.

---

[2] The Mother offers Ms. Thomas as an expert in the following fields: "treating healthcare provider;" "clinical social work;" and "assessment and treatment of early childhood emotional disorders, including disorders resulting in sexual abuse by custodial parents."

Indeed, she did not review the pertinent forensic evaluation conducted in May 2020[3] and available to her.

5.      Simply put, Ms. Thomas' proposed expert opinions fail the *Daubert* test for scientific reliability and relevance. The Court should exclude her *de bene esse* testimony from evidence at trial. The Father respectfully submits that Ms. Thomas' testimony will not assist this Court. Rather, the substantial prejudice of her testimony outweighs the zero probative value she brings to the table. Her testimony will only serve to unfairly prejudice the Father because of the unreliability of Ms. Thomas' opinions.

## II.     ARGUMENT

### A.     RULE 702 AND *DAUBERT* STANDARD FOR ADMISSIBILITY

6.      Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[3] On January 26, 2021, the Mother produced for the first time a SANE evaluation--a forensic sexual assault examination conducted on May 17, 2020 by a sexual assault nurse examiner at Augusta Health in Fishersville, Virginia. Ms. Thomas never produced this SANE evaluation to the Father even though it appears she had the evaluation all along because she forwarded it to counsel for the Mother yesterday. The Father therefore was unable to cross-examine Ms. Thomas on this relevant and probative record produced only yesterday.

7. In summary, FRE 702 requires i) first, that an expert witness be "qualified" in the subject matter, ii) if qualified, that she bases her opinions on "sufficient facts or data," and iii) that she has "reliably applied the principles and methods" in reaching her conclusions. Finally, if qualified and reliable, the proposed testimony must be relevant to assist the Court.

8. The proponent of the expert testimony—the Mother here—bears the burden to establish the testimony's admissibility by a preponderance of the evidence standard. *Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

9. The Supreme Court of the United States and the Fourth Circuit have adopted factors to determine whether or not proposed expert testimony is reliable, in part because "expert witnesses have the potential to be both powerful and quite misleading." *Id.* (citing *Daubert*) (internal citations omitted); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

10. This Court is the gatekeeper in its application of FRE 702 and *Daubert*.

11. The exact nature of the gatekeeping inquiry "depend[s] upon the particular expert testimony and facts of the case." *EEOC v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). District courts have "'broad latitude' to take into account any 'factors bearing on validity that the court finds to be useful.'" *Freeman*, 778 F.3d at 466.

12. *Daubert* holds that courts should consider four criteria when determining the reliability of expert testimony: (1) whether the proffered knowledge can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the relevant scientific field. *See Daubert*, 509 U.S. at 592-94. Courts must also consider the

4

sufficiency of facts in accordance with FRE 702. Finally, courts may consider any other factor. *See Kumho*, 526 U.S. at 152.

13. To further assess reliability, the Federal Rule Advisory Committee Notes have adopted additional important factors to the non-exhaustive *Daubert* list, which are used by courts around the country, which include:

> (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
>
> (8) whether the expert has adequately accounted for obvious alternative explanations.

Fed. R. Evid. 702 Advisory Committee Notes, 2000 Amendments (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered"); *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition)); *Roche v. Lincoln Prop. Co.*, 278 F. Supp. 2d 744, 748–49 (E.D. Va. 2003); *see also Rochkind v. Stevenson*, 471 Md. 1, 36, 236 A.3d 630, 650 (2020), *reconsideration denied* (Sept. 25, 2020).

14. In evaluating the proposed testimony, the Court looks to the principles and methodology employed by the expert rather than the expert's ultimate conclusions—though those often are inextricably intertwined. *Kumho*, 526 U.S. at 595. "[C]onclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

15. A "reliable" expert opinion is one based on scientific, technical or other specialized knowledge, and not based on belief or speculation. *Daubert*, 509 U.S. at 590. "[I]nferences must be derived using scientific or other valid methods.'" *Nease v. Ford Motor Co*., 848 F.3d 219, 229 (4th Cir. 2017) (internal citations omitted); *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 (4th Cir.

1997) ("A court will not credit an expert witness who . . . refers to no literature in the field and does not identify [relevant principles] but merely [gives] his own subjective opinion.").

16. An expert's testimony is "relevant" where it is "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (internal citations omitted). In other words, an expert's testimony should be excluded where its proponent cannot demonstrate that the evidence bears "a valid . . . connection to the pertinent inquiry." *Daubert*, 509 U.S. at 588; *see also General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997) (opining that an expert witness' testimony is irrelevant where "there is simply too great an analytic gap between the data and the opinion proffered").

17. Importantly, an expert's testimony also must rest on an adequate factual foundation. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994). A district court should exclude opinions that are "based on assumptions which are speculative and are not supported by the record." *Id.*

18. Under *Daubert*, therefore, the proponent offering expert witness testimony must show that the proffered testimony is both scientifically valid (peer-reviewed, testable, and generally accepted) and that it is based on a reliable factual foundation that fits the facts of the case. Conclusory, subjective opinions that are not tied to the actual facts of the case—and legal standards—do not meet this important standard.

19. The Mother cannot meet her burden here under the standards established in *Daubert* and adopted and applied by this Court to exclude proposed expert testimony. Ms. Thomas' testimony should be excluded.

### B.     MS. THOMAS' OPINIONS DO NOT SATISFY *DAUBERT* STANDARDS

20.     Two factors, *inter alia*, are fatal to Ms. Thomas' opinions' reliability: A) Ms. Thomas' unjustifiable extrapolation from an accepted premise to an unfounded conclusion; and B) Ms. Thomas' inadequate accounting for obvious alternative explanations.

21.     Ms. Thomas is a private play therapist. She first met the child at the Mother's behest in or about June 2020. Upon information and belief, Ms. Thomas is one of the many puppets duped by the Mother. The Mother has subjected the child, who is now only five years old, to at least 43 play therapy sessions with Ms. Thomas, along with at least two FBI interviews, treatment with an unlicensed therapist, treatment by medical doctors, and a forensic sexual abuse physical examination (showing no indication of any sexual abuse).

22.     In accordance with Federal Rule of Evidence 702, Ms. Thomas should not be admitted to provide expert testimony in any field. Although Ms. Thomas has the educational and licensing credentials that may otherwise be sufficient to qualify her as an expert in certain play therapy, her testimony does not meet the Rule 702 requirements. The Mother has not demonstrated that Ms. Thomas has scientific, technical, or other specialized knowledge that will help the Court to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702(a). Ms. Thomas' testimony is not based on sufficient facts or data. *Id*. at 702(b). Her testimony is not the product of reliable principles and methods. *Id*. at 702(c). She has not reliably applied any such principles or methods to this case. *Id*. at 702(d). Likewise, Ms. Thomas' opinions and the methodologies employed to reach her opinions, do not meet the *Daubert* standard and her testimony should be excluded.

23.     At best, Ms. Thomas had been provided a self-serving and incomplete historical account from the Mother of A.E.N.'s chaotic life. Ms. Thomas claims that the child has disclosed,

after 43 therapy sessions, multiple evaluations, and two FBI interviews, that the Father touched A.E.N.'s vagina with his fingers, has put "stuffies" (stuffed animals) between the child's legs, and—based solely on the Mother's reporting to Ms. Thomas—masturbates a lot. Ms. Thomas never alerted the Father that she was treating the child, never once tried to speak to the Father, and never obtained the Father's consent to treat the child.

24. Ms. Thomas claims to have "diagnosed" the child through play therapy with the following mental disorder diagnoses: (A) Adjustment Disorder With Mixed Disturbance of Emotions and Conduct; (B) Post Traumatic Stress Disorder; (C) Reactive Attachment Disorder; and (D) Child Sexual Abuse.[4] Yet Ms. Thomas concedes, as she must, that she has never conducted a forensic evaluation of the child. She claims to have conducted a clinical evaluation of the child, but no such clinical evaluation has ever been produced by the Mother in response to the Father's discovery request calling for all such evaluations and related documents.

25. Not only is Ms. Thomas not qualified to render the opinions she offers, her opinions are inherently and inextricably unreliable.

26. First, the sufficiency of facts. Ms. Thomas has never spoken with the Father, CPS, the Canadian authorities, and never obtained the Father's consent to provide any treatment for the child. The Mother cherry-picked what history to convey to Ms. Thomas, and chose not to provide her with a copy of the February 6, 2020 Canadian Consent Order banning the removal of the child from Canada at any point in her treatment of the child. And, Ms. Thomas never challenged the Mother even once for collateral information. Ms. Thomas had approximately 20 telephone calls

---

[4] In fact "child sexual abuse" is not a DSM-5 diagnosable disorder at all, and cannot be treated as a mental disorder. Rather, it is listed in DSM-5 under "Other Conditions That May Be a Focus of Clinical Attention."

8

with the Mother—none of which she documented. Not one. Ms. Thomas' unscientific approach is to accept willy-nilly as true everything the Mother tells her, and never test the information.

27.   Instead, Ms. Thomas relies almost exclusively on the child's self-report and self-play. Ms. Thomas offers no analysis of play therapy's reliability to determine the veracity of any such statements. When asked about the child's veracity and memory functioning, Ms. Thomas simply replied she had no reason not to believe the four-year-old child—not that she had implemented appropriate methodologies to determine the child's veracity and memory.

28.   Ms. Thomas did place all her reliance on a dubious test *before* treatment had ever begun: The "Adverse Childhood Experience Questionnaire" ("ACE"). Ms. Thomas reports that the *Mother* completed the form on behalf of A.E.N. and based on A.E.N.'s history. The form is astonishing in its absurd reporting of the extreme brutalization of the child. No surprise then that Ms. Thomas reports that the score was very high. But again, there is no scientific testing applied. There is not even a superficial consideration of how a child who has allegedly been brutalized in the extreme could possibly be the functioning child who is fully engaging in play. Ms. Thomas refuses even to acknowledge that the Mother's "history" of the child is tainted by the fact that the Mother abducted the child from Canada, where the child had been in the Father's *exclusive* care for the preceding two plus years.

29.   Ms. Thomas' sufficiency of facts (or lack thereof) is non-existent because of her mismanaged record-keeping system.[5]

---

[5] Due to the highly dysfunctional nature of Ms. Thomas' recording system, the Father did not have, prior to his cross-examination of Ms. Thomas, essential records from her file. During cross-examination, Ms. Thomas alerted Father's counsel to records that she was holding in front of her during the *de bene esse* testimony. But Ms. Thomas stated that she refuses to provide any such records without service of a subpoena. The Father was therefore denied the opportunity during the *de bene esse* testimony to cross-examine Ms. Thomas to any level of sufficiency.

30. Second, the known or potential rate of error. Ms. Thomas, by her own admission, functioned as a therapist in this case and not as an evaluator. There is no scientific basis for her conclusory claims that not only was the child sexually abused by her father but that she would be subjected to grave risk of harm if she is returned to his care. Ms. Thomas failed even to consider or allow for the therapeutic process itself to be a factor that affected the data. Ms. Thomas claims she is not familiar with the child psychology construct of demand characteristics (simple cues that convey the therapist's wishes, expectations, and worldviews to clients and influence their behavior). She had no gauge whatsoever for any rate of error.

31. Third, extrapolation to unfounded conclusions. Ms. Thomas reposes unwarranted confidence in projective methods such as sand play and drawings in formulating her conclusion regarding the likelihood that sexual abuse has occurred. In doing so, she appears unaware of the prevailing social science literature cautioning that such tools – while often used in a *therapeutic* context – have not been shown to reliably distinguish between those who have been abused and those who have not. Ms. Thomas drew conclusions about the Father without ever meeting him or evaluating him.

32. Further, Ms. Thomas attempts to usurp this Court's function as trier of fact and law. She attempts to serve as judge and jury by convicting the Father without any checks and balances whatsoever in her own methodologies. The grave risk determination is within this Court's purview, not Ms. Thomas. "[C]onjecture or 'subjective belief' or 'unsupported speculation' will not suffice." *Roche v. Lincoln Prop. Co.*, 278 F. Supp. 2d 744, 748 (E.D. Va. 2003).

33. Fourth, alternative explanations. "If faithfully applied, the methodology of differential diagnosis 'has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results.'" *Roche*, 278 F. Supp. 2d at 751

(citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir.1999)). The process of differential diagnosis "generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is most likely." *Id.* "A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion." *Id.*

34. Ms. Thomas has concluded that the Father sexually abused the child. Ms. Thomas petulantly refuses to consider any differential diagnoses in reaching her conclusion. Ms. Thomas failed to avail herself of sufficient data to affirm such diagnoses or to adequately understand the panoply of issues to which her client may have been responding. She refused to consider even a hypothesis put to her as an alleged expert. Most troubling, Ms. Thomas ultimately "diagnosed" the child with an alleged DSM-5 child sexual abuse diagnosis that does not in fact exist in DSM-5.

35. "Thus, if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) (internal citations omitted). So here.

36. Fifth, testing, peer-review, general acceptance. Under professional psychological guidelines, an expert should not opine with the level of conviction Ms. Thomas harbors that sexual abuse 100% did or did not occur. Her single conclusion is not based on any scientifically valid methodology. She is not a forensic examiner. Rather, she *treats* children for alleged abuse. However, Ms. Thomas concluded (or assumed) that the child was abused without any foundation before ever treating the child. Despite her own subjective and pejorative convictions, Ms. Thomas is not tasked with determining if abuse did or did not occur.

11

37. Ms. Thomas did not rely on professional, peer reviewed sexual abuse treatment protocols and guidelines. These peer review tools are non-existent in her analysis. It defies belief that Ms. Thomas claims to have no knowledge of the infamous *McMartin Child Abuse Trials.* Ms. Thomas admits she has no clinical understanding of the incidence of fungal infections in young children, and the alarming rate at which this pathology is growing in children.

38. Finally, Ms. Thomas failed to account for any external influences or pressures, the potential susceptibility of the child, and the motives of the child and the Mother. She failed to account for (and was obliviously unaware) the demand characteristic psychological construct, particularly in light of the Mother repeatedly subjecting the child to multiple evaluations soon after she abducted the child from Canada. Ms. Thomas exhibited extreme bias against the Father. She utterly refused to account for any impact on the child as a result of the Mother abruptly removing the child from her primary caretaking parent, the Father, without even a goodbye.

39. Ms. Thomas' proposed expert testimony is not good science.

## III.   CONCLUSION

40. "[A] determination regarding the scientific validity of a particular theory requires not only an examination of the trustworthiness of the tested principles on which the expert opinion rests, but also an analysis of the reliability of an expert's application of the tested principles to the particular set of facts at issue." *Roche*, 278 F. Supp. 2d at 749 (quoting *Cavallo v. Star Enterprise*, 892 F.Supp. 756, 762–63 (E.D.Va.1995), *rev'd in part on other grounds*, 100 F.3d 1150 (4th Cir.1996)).

41. This Court should hold that Ms. Thomas has failed to adhere to established methodologies, including differential diagnoses. Her one dimensional reliance on the child's self-

report and self-play is "insufficient to satisfy the requirements of *Daubert* and its progeny." *Id.* Ms. Thomas' proposed testimony is "scientifically invalid." *Id.* And it is dangerous.

42. This Court should therefore employ its gatekeeping function and exclude Ms. Thomas' testimony as inadmissible under *Daubert*.

**WHEREFORE**, the Petitioner respectfully requests that the Court:

A. Grant this Motion *in Limine*; and

B. Exclude the Respondent's proposed expert witness, Laurie Thomas, LCSW-C, from testifying at the evidentiary hearing; and

C. Sustain the Petitioner's objections to the Respondent's proposed expert witness testimony; and

D. Grant the Petitioner such other relief that the interests of justice and his cause may require.

/s/ Kelly A. Powers
Kelly A. Powers
VSB No. 84714
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 465-8375
(410) 773-9102 (fax)
kpowers@milesstockbridge.com

Stephen J. Cullen, *Admitted Pro Hac Vice*
Leah M. Hauser, *Admitted Pro Hac Vice*
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 465-8374
(410) 385-3709 (fax)
scullen@milesstockbridge.com
lhauser@milesstockbridge.com
*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of January, 2021, a copy of the foregoing Petitioner's Motion *in Limine* was electronically filed and is available for viewing and downloading from the ECF system to all counsel of record.

/s/ Kelly A. Powers
Kelly A. Powers, VSB No. 84714
