UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| BRYCE GERALD RANDALL NOWLAN, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 5:20-cv-00102 |
| | ) | |
| v. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| | ) | |
| NINA LYNN NOWLAN, | ) | By:   Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Respondent. | ) | |

This proceeding is the culmination of years of protracted litigation, both in the United States and Canada. It is also the latest in a tragic series of events arising from the toxic relationship between two parents that has led to the upheaval of their young child's life. Both parents have histories of drug and alcohol abuse, domestic violence, and alleged infidelity. These issues—and the parents' hatred of each other—have adversely affected their child ("AEN").[1] If nothing else, this proceeding is an indictment, and hopefully a wake-up call, to show the parents that if they persist in this destructive behavior, AEN alone will suffer the consequences.

Petitioner Bryce Nowlan ("Petitioner," "Mr. Nowlan," or "Bryce"), a Canadian citizen and AEN's father, alleges that Respondent Nina Nowlan ("Respondent," "Ms. Nowlan," or "Nina") wrongfully removed AEN from Canada in February 2020 in violation of his custody rights. Petitioner filed the instant petition for her return to Canada under the Hague

---

[1] To protect the minor child's identity, she will be referred to solely by her initials.

Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 ("Hague Convention"). Respondent opposes the petition. She argues that Petitioner has failed to establish a *prima facie* case under the Hague Convention because AEN was never habitually resident in Canada. She also claims that Petitioner sexually abused AEN while she was in Canada, and that returning AEN to Canada would put her at a grave risk of harm. As discussed below, Petitioner has established a *prima facie* case under the Hague Convention, and Respondent has failed to demonstrate, by clear and convincing evidence, that Petitioner sexually abused AEN and therefore that the "grave risk" exception applies. The court will therefore grant Petitioner's petition and order AEN's return to Canada.

## I.   PROCEDURAL POSTURE

Petitioner filed a Request for Return of Child with the United States Department of State on March 24, 2020. (Pet'r Ex. 3.) After Petitioner retained counsel in the United States, he filed the instant petition on December 15, 2020. (ECF No. 1.) The court appointed a guardian *ad litem* ("GAL") for AEN, Ms. Briana A. Stevens, on December 22, 2020.[2] (ECF No. 19.) The court further appointed Mr. Paul Beers as *pro bono* counsel for Respondent. (ECF No. 31.)

Under the expedited Hague Convention timeline, the court set this matter for a bench trial on January 28–29, 2021. Ms. Stevens filed her GAL Report on January 25, 2021 (ECF No. 58),[3] and the court proceeded with the scheduled bench trial. The court reconvened the

---

[2] The court expresses its sincere thanks to Ms. Stevens. The court recognizes that she spent a significant amount of time on this matter. She interviewed numerous people, conducted a thorough investigation, wrote a superb report, and advocated for AEN's interests in this Hague Convention proceeding. Ms. Stevens has been immensely helpful to court.

[3] The GAL Report provided a thorough factual background under the legal framework of the Hague

bench trial on February 2, 2021, in order to complete the presentation of evidence. At the end of the third day of trial, the court decided that it needed an impartial expert opinion regarding Respondent's allegations that Petitioner had sexually abused AEN. The court, with the parties' consent and for the reasons outlined in the order of appointment (ECF No. 74), appointed Dr. Keith Fender and Dr. Rebecca Loehrer of Blue Ridge Counseling, LLC, to conduct an independent examination of the sexual-abuse allegations. Drs. Fender and Loehrer submitted their report on March 25, 2021. (ECF No. 81.) The court reconvened the bench trial for a final day on April 22, 2021, in order to give the parties an opportunity to examine Drs. Fender and Loehrer.

After reviewing the voluminous record, the evidence adduced at trial, the GAL Report, and the expert report of Drs. Fender and Loehrer, the court issues this memorandum opinion to rule on the merits.

## II.    FINDINGS OF FACT

There are many relevant facts in this matter regarding not only AEN's life, but also numerous court cases in both the United States and Canada. For the most part, the following facts are presented in chronological order, unless otherwise noted.

### A.    The Parties

Bryce Nowlan is a corporal in the Canadian Armed Forces and is posted in Petawawa, Ontario, Canada. He works as a weapons technician. Nina Nowlan is a veteran of the United States military, as she was honorably discharged in 2013. During her time in the military, Nina

---

Convention. The GAL Report, however, did not provide a recommendation or take a position on the ultimate issues in this proceeding.

served in Afghanistan, and she was later raped by a fellow soldier, leading to her discharge. She is currently on 100% service-connected disability under the Department of Veterans Affairs due to injuries she sustained in the military. She testified that she currently suffers from post-traumatic stress disorder, anxiety, insomnia, and that she has had depression in the past. Nina also testified that she was sexually abused as a child.

Bryce and Nina are the parents of AEN, a five-year-old child. Because she was born in Virginia, AEN is a United States citizen. Bryce asserts that AEN is entitled to Canadian citizenship, but that Nina never consented for AEN to obtain it.

## B.    The Parties' Marriage, AEN's Birth, and the Parties' Separation

Shortly after meeting online, Bryce and Nina were married in December 2014, and Nina soon became pregnant with AEN. In August 2015, while Nina was pregnant, she attempted to move to Canada. Canadian border personnel turned Nina away because of her criminal record. Nina returned to Virginia.

AEN was born in November 2015.  Bryce moved to Virginia during his parental leave, and the Nowlans lived in Nina's mother's home. According to Bryce, it became apparent during that time that Nina had a serious problem with alcohol. Nina asserts that Bryce also had a drinking problem and was prone to violent outbursts during this time. In the summer of 2016, Nina moved to Watertown, New York, so that she and AEN could be closer to Bryce. Bryce returned to work in August 2016. He visited Nina and AEN on many weekends in Watertown over the next several months. Nina asserts that, during her time in Watertown, Bryce was verbally, physically, and emotionally abusive. Bryce counters that Nina was having an affair with another man. The marriage eventually failed, and Bryce and Nina separated in

November 2016. Bryce began dating another woman, Kali Guenther, in approximately November 2016. The exact timeline is unknown.

After Bryce and Nina separated, but on a weekend when Bryce went to Watertown to visit AEN (either in late 2016 or early 2017), Bryce took photos of Nina's apartment. (Pet'r Ex. 30.) The photos depict a dirty and cluttered home; there are beer cans and bottles all over the kitchen counter and trash littered liberally throughout the apartment. (*See id.*)

## C. Watertown Domestic Violence Incident Occurs and Nina Moves to Virginia

On January 4, 2017, Bryce went to Watertown to visit AEN. It is undisputed that a domestic-violence incident occurred between Bryce and Nina, but the facts are disputed. Nina called the police the following day. The police report describes two versions of events. (Pet'r Ex. 31.)

Nina told the police that Bryce "threw a baby gate at her, hitting her on the right calf[,] and pushed her, causing her to fall into their child." (*Id.*) Nina "started crying, and she became upset with Bryce[,] so she punched him in the head." (*Id.*) She reported that Bryce left after the incident. At trial, Nina testified about the incident:

> He came inside. We were in the kitchen. He started yelling kind of like also chest bumping me to try to like get a response out of me. Didn't give it to him. He ended up having me shoved up against the counter where my back is like over the top of it which led me to push him to get off me. And so that's when I turned to go outside, and he throws the baby gate at me.

(Trial Tr. Day 2, at 141:22–142:3.) Nina submitted a photograph of the bruise on her calf. (Resp't Ex. 21.) She testified that she briefly went outside to smoke a cigarette, and then came back inside. In the living room, she told Bryce to leave. She testified that Bryce shoved her in AEN's direction, and that she twisted so she would not land on AEN. Nina landed on the

5

ottoman and stated that the landing cracked her rib. At that point, Nina testified that she got

up and punched Bryce in the head. She denied having Bryce's passport. There is no medical

evidence in the record about Nina's cracked rib.

Bryce stated that Nina was intoxicated when he arrived at the home. When he tried to

leave after several hours, Nina apparently hid his passport, became upset, and "started

punching him in the head and face to the point [where] his nose was bleeding." (Pet'r Ex. 31.)

According to the police report, Bryce said that he knocked over the baby gate while trying to

get away from Nina, but he "denied throwing the gate." (*Id.*) He reported that AEN was

nowhere near the incident. In his later affidavit in the Canadian Hague Proceeding (discussed

below), however, Bryce stated that when Nina pushed him through the baby gate, he "tossed

it back through the doorway, hitting her on the leg." (Resp't Ex. 5 ¶ 23.) At trial, Bryce testified:

> [I]t turned into a screaming match, and then I ended up getting
> shoved a few times. I got thrown through the baby gate. I turned
> around, grabbed the baby gate, and threw it back into the kitchen,
> and it ended up striking Ms. Nowlan in the leg. After she ended
> up smashing my nose is when I returned back to Canada that
> night.

(Trial Tr. Day 1, at 118:13–19; *see also id.* at 153:13–17 ("I don't have an excuse for it, but it

was because I got punched in the nose and thrown through a baby gate. I turned around and

grabbed [the baby gate] and threw it back in the kitchen. I didn't realize she was walking

through, and it hit her in the leg.").)

In the "additional narrative" section of the police report, the officer reported: "As I

was taking the report it appeared that Nina was intoxicated. Beer cans and bottles filled the

counter in the kitchen. Nina advised me she had four beers this morning for self[-

]medication." (Pet'r Ex. 31.) An "advocate" had also spoken with Nina. The advocate advised

the officer that "she believed Nina was intoxicated at this time as well." (*Id.*) The officer therefore did not take an official statement from Nina, but he advised her to contact him when she was sober.

The police officer contacted New York Child Protective Services ("New York CPS"). The police report further notes that, on January 11, 2017, Nina inquired about obtaining a protection order. (*Id.*) On February 28, 2017, Nina spoke with a police officer, stating that she wanted to press charges against Bryce. (*Id.*) The end of the police report states Nina no longer wished to pursue charges because she was leaving the area. (*Id.*) New York CPS closed its file when Nina moved back to Virginia in February 2017.

According to Bryce, when Nina moved back to Virginia, she told Bryce that he would never see AEN again. (Resp't Ex. 5 ¶ 26; *see also* Trial Tr. Day 1, at 78:8–11 ("When she moved [AEN] from New York and I got a phone call saying that if I ever wanted to talk to my daughter again, that was the last time because they were on their way back to Virginia.").) Bryce did not see AEN for the following two months, because he was "not allowed" by Nina. (Trial Tr. Day 1, at 78:22–24.)

At some point around this time, Bryce messaged Nina a picture of a noose, followed with: "This is on you. Have your fucking money I'm done. Make sure you take good care of [AEN] for me." (*See* ECF No. 36-1 at 18; Resp't Ex. 20.) Bryce testified: "[I]t was basically me just being at the ends of my rope. I had lost my wife to another married man, I was told I was never going to see my daughter again, and I was home alone in a cube [b]y myself." (Trial Tr. Day 1, at 131:10–13.) Bryce testified that he self-admitted to Warrior Support, the Canadian military's mental-health program, after this incident.

### D.    Virginia CPS Becomes Involved and Bryce Takes AEN to Canada Upon the Parties' Agreement

When Nina moved back to Virginia, she and AEN lived with Nina's mother, Loretta Brown. Nina testified that she was self-medicating with alcohol and was "not in good shape." (Trial Tr. Day 2, at 149:7–10.) Nina later described herself as having "[a]n emotional crisis." (Trial Tr. Day 2, at 152:1.) The GAL Report notes that, during this time, Nina "reported that she did not have substance abuse issues." (ECF No. 58 at 9.) On March 17–18, 2017, Nina and Ms. Brown had an altercation. Ms. Brown called the police "to teach [Nina] a lesson." (Pet'r Ex. 37 ¶ 7.)[4] Nina was ultimately arrested for public intoxication, and Virginia Child Protective Services ("Virginia CPS")[5] became involved. CPS temporarily suspended Nina's contact with AEN and placed AEN in Ms. Brown's care. (*See* Pet'r Ex. 36 (March 20, 2017 Virginia CPS letter to New York CPS: "At this time the child is currently in a diversionary placement with the grandmother, Loretta J. Brown. The mother expressed great concerns about the child remaining in her care, that she is being abused.").)[6] On March 29, 2017,

---

[4] In Ms. Brown's affidavit, submitted as part of the Canadian Hague Proceeding (discussed below), she described the incident as follows: "Nina had just come back from having drinks with friends, celebrating St. Patrick's Day. Upon arrival, the police officer, who was one of my friends, told Nina to remain in the bedroom. However, Nina went outside to have a cigarette, disobeying the officer's instructions, and this is when she was taken in by the police." (Pet'r Ex. 37 ¶ 7.) The incident continued the following day when Nina returned home from the police station. (*Id.* ¶ 8.) Nina told Ms. Brown that she was leaving with AEN, and Ms. Brown "called the police a second time." (*Id.*) Ms. Brown further described the incident: "When the police arrived, in the heat of the moment I described all of my concerns to the officer. I was very upset at the time and I wanted to look out for my granddaughter." (*Id.*)

[5] In the records before the court, Virginia CPS is sometimes referred to as the "Shenandoah Valley Social Services." (*See* Pet'r Exs. 26, 28.)

[6] The court notes as a general matter that during Ms. Brown's testimony, she had difficulty with her memory. In particular, her testimony appeared inconsistent on this point. Her affidavit before the Canadian Hague Court and the Virginia CPS letter suggest that Ms. Brown was concerned about AEN being abused. (*See* Pet'r Ex. 37 ¶¶ 7–8; Pet'r Ex. 36.) At trial, Ms. Brown testified that she just "wanted to see what happened in New York," and that it "wasn't about the safety of my granddaughter." (Trial Tr. Day 2, at 71:11–13; *id.* at 39:19–25.)

Virginia CPS contacted Bryce, advised him that the agency was removing AEN from Nina's care, and asked him to participate in a meeting the next day. That same day, Nina and Bryce had a conversation over text message:

> **Bryce:** Why did I just get a call about [AEN] going into foster care[?]
> **Nina:** My mother.
> **Bryce:** What's the number for them I need it now.
> **Nina:** Answer
> **Bryce:** I did . . . Wtf happened Nina
> **Nina:** Mom called the cops. Like always. Blew this up
> **Bryce:** Why did she call the cops
> **Nina:** You aren't here you never are. I'm suing Augusta County as well. Ready to join the club and fight for our family? Put our issues aside to go after my mom and the duties [*sic*] . . . Call me when you can. Also she is trying to say we trashed her place and left bills and never help pay anything while we were there. Trashed her place after we left. Lies. I'm fighting for our daughter. My mom is trying to play God and take her. Unfortunately I have recorded everything and I have a meeting with a lawyer to go after her and her fuck buddy deputies. I'm sick of this. All I want is to be happy with our daughter. I will even move back to New York for you to see her. I should've never moved. She had this planned for a while. . . .[AEN] is our world Bryce. My mom does not take proper care of her. You and I know this. She allowed her fucking boyfriend to lay in bed alone with her. Which caused me to be livid. Leading to this.

(Pet'r Ex. 35.) According to Nina, she also "called Bryce and asked for him to . . . have [AEN] for a couple months with the intention on returning and that he couldn't have her in August of 2016 because he was going to deploy anyway." (Trial Tr. Day 2, at 151:11–14.)

On March 30, 2017, Nina and Bryce participated in a Virginia CPS Family Partnership Meeting, along with two social workers, an agency facilitator, Ms. Brown, and Nina's aunt. It was agreed that Bryce would take AEN, but the parties dispute the details of the agreement. Nina claims that they agreed for Bryce to return AEN to her in July 2017 (*i.e.*, that he would

keep AEN for four months). (*See also* Trial Tr. Day 2, at 152:18–20.) Bryce maintains that there was no set "end date," and thought that Nina would have to comply with the Virginia CPS treatment recommendations before returning AEN. He later described it as an "open-ended agreement arranged through CPS." (Resp't Ex. 5 ¶ 66.) Bryce's trial testimony on this point was consistent. (Trial Tr. Day 1, at 77:14–17; *see also id.* at 165:24–25 ("The agreement was to keep [AEN] in Canada until [Nina] could provide the Canadian courts that she had done [the Virginia CPS recommendations].").) Notably, none of the Virginia CPS documents discussing the Family Partnership Meeting specify any such "end date."

On April 1, 2017, Bryce and his girlfriend drove to Virginia, picked up AEN, and drove her back to Canada. AEN was 16 months old at the time. Bryce and Nina continued texting, largely consisting of Nina expressing that she missed AEN, and Bryce sending pictures of AEN and updates to Nina. (*See* Resp't Ex. 1.) On April 18, 2017, Bryce asked Nina if she had been in contact with Kellie Woods, a Virginia CPS employee. (*Id.*) The following day, when Nina texted Bryce to "[b]ring my daughter back to America," Bryce responded: "Sorry I'm not allowed to. . . . According to [K]ellie [you're] not allowed to see her unless I'm there and until you've finished your mandated courses and she specifically gives me the go ahead to let you see her." (*Id.*) Later, Bryce reiterated, "Kellie said [you're] not to see [AEN] until she [okays] it." (*Id.*)

Between March 29, 2017 and May 2017 (as far as the court is aware), Ms. Woods texted with Bryce.[7] (Pet'r Ex. 27.) While the texting conversation is sporadic, on April 27, 2017 (less

---

[7] The court examines these text messages solely for the effect they had on Petitioner, not for the truth of the matter asserted therein.

than one month after Bryce picked up AEN), Bryce told Ms. Woods that Nina and her mother "have been trying to get me to bring [AEN] back or bring her to [New York] so they can spend a weekend with her." (*Id.*) On May 10, 2019, Bryce texted Kellie asking for an update, and stated that Nina "wants me to bring [AEN] down to her but I told [Nina] that I'm not allowed." (*Id.*) Ms. Woods informed Bryce that Nina was "not cooperating," and later repeated on May 11, 2017, that "Nina has been inconsistent with the department and not cooperating." (*Id.*) Ms. Woods then advised Bryce that "[i]t would be in your best interest to wait with visits until you have papers by the courts of custody." (*Id.*) Bryce responded, "I was not planning on letting [Nina] see [AEN] until you told me it was okay." (*Id.*)

Bryce did not return AEN to Nina in July 2017, and AEN continued to live in Canada. Nina testified that Bryce did not allow her to communicate with AEN for "basically the first year she went up there." (Trial Tr. Day 2, at 154:2–3.)

The court briefly departs from chronological order to discuss several other documents from Virginia CPS and their significance. First, in a letter addressed to Bryce from Ms. Woods, dated April 19, 2017, Virginia CPS reported that "the department is currently working with the mother on services" regarding "substance abuse, mental health, and stable housing." (Pet'r Ex. 26.) The letter further states:

> [Virginia CPS] held a Family Partnership Meeting on March 30, 2017 to assess the needs for services and make appropriate recommendations for the mother. In addition[, to] have the child remain in a safe environment *until the mother completed and complied with all services.* During this meeting the mother, Nina Nowlan[,] requested for the father, Bryce Nowlan[,] to come and get the child because she did not want the child to remain with any family members that reside in this locality. At this time it was established that neither of the biological parents had legal custody established. Thus[,] making the arrangement with the father the

most ethical agreement amongst all participating members.

(*Id.* (emphasis added).) Finally, the letter notes that Virginia CPS has "moved forward with services with the mother and will advise if she follows through with all recommendations." (*Id.*) The letter did not mention any planned date upon which Bryce would return AEN.

Second, Virginia CPS sent a letter to Nina, Bryce, and the "Canadian Courts" on May 25, 2017. (*Id.*) Broadly speaking, the letter communicates Virginia CPS's recommendations for Nina and notes that "[t]he court[] may choose to support this recommendation or make [its] own." (*Id.*) Virginia CPS recommended "that contact between Ms. Nowlan and [AEN] be supervised and at the discretion of Mr. Nowlan." (*Id.*) It also recommended that "Ms. Nowlan only be able to proceed with unsupervised visits when she could provide the Canadian Courts" with evidence that she completed the recommendations. (*Id.*) Specifically, Virginia CPS recommended that Nina (1) complete a psychological evaluation and adhere to all mental health and substance abuse recommendations; (2) attend local Alcoholics Anonymous meetings (or other treatment for alcohol abuse); and (3) attend a parenting class. (*Id.*)

Third, on June 16, 2017, Virginia CPS sent a "closing family assessment letter." (Pet'r Ex. 28.) The letter is almost identical to the May 25, 2017 letter, but additionally notes Virginia CPS attempted to initiate a psychological evaluation with Nina, "but she has self-reported relocated out of this area, and has not followed up with scheduled meetings." (*Id.*)

Fourth, a Virginia CPS "Assessment Summary" dated July 12, 2018 (approximately one year later), contains the following statements:

- The mother, Nina Nowlan[,] was not cooperative with the department and appeared to be very manipulative. Ms. Nowlan did not follow through . . . with any services to assist with her mental health, substance abuse[,] and parenting skills to prevent further abuse of her child.

- The department requested multiple times for verification on services with Ms. Nowlan, and at this time the department has never received any information that the mother verbally advised what she was doing.

- After further assessing the situation, the risk level is Very High. The department assisted with helping the mother with services but at this time the mother [has been] uncooperative and did not comply with any request by the department. This case was not recommended for on-going services due to the child is now living in Canada with the father and Ms. Nowlan's uncooperativeness with CPS.

- At this time the department will be closing this case, due to Ms. Nowlan's uncooperativeness and the father, Bryce Nowlan[,] has filed for custody of the child in Canada.

(Pet'r Ex. 29.)

Finally, the court returns to the "closing family assessment letter," discussed above.[8]

(Pet'r Ex. 28.) Nina testified that she went back to Virginia CPS in March 2019 because she

wanted them to note that she was complying with the recommendations, even though the case

was already closed. (*See* Trial Tr. Day 2, at 203:7–21.) Regarding the first recommendation that

---

[8] It appears that there were two copies of this letter: the original letter and an updated letter. The first copy from June 2017 does not contain any underlined portions, and the second copy, dated March 3, 2019, includes "updated" underlined portions. Stated differently, the *underlined* portions are from 2019; the nonunderlined portions are from 2017. There is an underlined note at the top of the letter stating: "This letter is in response to information that was obtained on [March 13, 2019] by Ms. [Nowlan] who presented at my office." (Pet'r Ex. 28.) March 2019 was after Virginia CPS closed its file, and also coincides with Nina filing her own Hague Petition in Canada, which the court will discuss below. The "updated" letter notes that Nina gave "Social Worker Martino the following information for the recommendations set forth in the closing family assessment letter dated June 16, 2017." (*Id.*)

Nina receive a psychological evaluation, Nina provided CPS with a "progress note" from Dr. Daniel Kline, dated February 26, 2019. (*Id.*)  The progress note, attached to the letter, indicates that Dr. Kline was Nina's psychiatrist at the Salem Veterans Affairs Medical Center. (*See id.*) The progress note states that Nina "denie[d] any substance use or misuse of [alcohol]," but later noted that her "[c]annabis abuse [was] in early remission." (*Id.*) As to the second recommendation to attend Alcoholics Anonymous meetings, the updated letter noted that it was a moot point due to Dr. Kline's progress note. Finally, the social worker enrolled Nina in a parenting class. (*Id.*)

Nina testified that she did not think the Virginia CPS "recommendations" were "legally binding." (*See* Trial Tr. Day 2, at 200:16–17.) It appears that she viewed them as suggestions. While there was never a court order requiring Nina to complete the Virginia CPS recommendations, it appears that Bryce viewed the Virginia CPS recommendations as "requirements" for Nina. Bryce believed that he could not return AEN to Nina until she completed the requirements.

### E.    AEN's Life in Canada

It is undisputed that AEN remained solely in Canada from April 1, 2017, until February 23, 2020, or approximately one month shy of three years.

When Bryce returned to Canada after picking up AEN in Virginia on April 1, 2017, Bryce and AEN lived with Bryce's roommate, Sheldon Combden, and another man named Koven Mellish, for a "short period of time." (Trial Tr. Day 1, at 218:20.) After that, Bryce acquired a "Primary Military Quarters," which is a three-bedroom house. He testified—and other testimony corroborated—that AEN had her own bedroom, he had a bedroom, and she

had a spare "play room." (Trial Tr. Day 1, at 44:18–21.) In AEN's bedroom, after she grew out of her crib, Bryce built AEN a twin bed. (*See* Pet'r Exs. 10, 13.) Bryce also built a structure over the bed, hung a military camouflage cover over it, and strung twinkle lights under the cover. She had many stuffed animals, which AEN referred to as "stuffies." (Trial. Tr. Day 1, at 64:4; Pet'r Ex. 13.) Although Bryce is a weapons technician, he testified that he is not permitted to keep any Canadian Army weapons in his home. He also testified that he does not "own any weapons," nor has he ever attempted to obtain a private gun license. (Trial Tr. Day 1, at 62:7–11.)

At the end of 2017, between late September and early December, Bryce was on exercise with the military and away from home (although still in Petawawa) for approximately two-and-a-half months. During that time, AEN stayed with Bryce's parents in New Brunswick. Bryce testified that he no longer goes on exercises that take him away from home because was placed in a new position. Bryce has never been deployed overseas.

While AEN was in Canada, Bryce enrolled AEN in daycare with a woman named Kristen Larsen for approximately six months. After that time, AEN was enrolled in daycare with a woman named Mel Harrison, who "did day-care providing for the military." (Trial Tr. Day 1, at 49:10–11.) AEN was in daycare with Ms. Harrison for approximately six months as well, until she was old enough to start school and no longer needed full-day daycare. When it was time for her to start school, Bryce enrolled AEN in Junior Kindergarten. The court has reviewed a photo of AEN's first day of school, as well as her class picture. (Pet'r Exs. 10–11.) Sara Bryan was also a caregiver for AEN for several months at the end of 2019.

The court reviewed other pictures of AEN's life in Canada. There are pictures of Bryce

15

and AEN camping together and AEN playing in the snow. There is a picture of AEN smiling on the back of a horse, in the back of the car with her dog (Minnie), and lying in bed holding her stuffed animals. On AEN's fourth birthday, she is wearing a princess dress and is pictured with a cake that has a character from the children's show "Paw Patrol" on it. The blanket on AEN's bed also has Paw Patrol characters on it. There is another picture with AEN and Bryce's extended family on Christmas. The court has further reviewed pictures of Bryce's home.[9]

Bryce put AEN on his primary health care system through the Canadian military, which entitled her to "full Blue Cross medical coverage anywhere in the world," as well as dental and vision care. (Trial Tr. Day 1, at 44:2–9.) Bryce also testified that he obtained "temporary health cards" for AEN, which each lasted roughly one year. (Trial Tr. Day 1, at 43:10.) Petitioner's Exhibit 20 contains a picture of one of AEN's health cards. That particular card was issued on May 14, 2018, and it expired on June 30, 2019. Bryce testified that he did not have a current health card for AEN because he "was told after the second [temporary card] that [AEN] needed her citizenship status to get her permanent health card." (Trial Tr. Day 1, at 74:20–21.) Bryce further testified that he filed the paperwork to obtain AEN's Canadian citizenship, but because he did not have sole custody over AEN and Nina refused to consent to AEN's Canadian citizenship, he was unable to obtain a permanent health card for AEN. Finally, Bryce mentioned that he took AEN for "initial checkups and vaccinations" at the military base on three separate occasions, where a doctor examined AEN. (Trial Tr. Day 1, at 144:10–17 "So

---

[9] The pictures are located in the record as Petitioner's Exhibits 10–13.

they go in, they check her height, her weight, they check her eating habits, sleeping habits, how she's doing."); *see also id.* at 147:19–22 ("[S]he had the wellness exams when she went in to get her catch-up shots. So the initial one was when we first got her health care, and then the other two were when she went in for the catch-up shots.").) Bryce was unable to obtain AEN's medical records due to the Covid-19 pandemic, so the court is unable to confirm the dates of those health checkups.

Bryce testified that in Canada, when a child is sick, parents often take their children to go see a pharmacist, as opposed to a medical doctor or a nurse practitioner. (*See* Trial Tr. Day 1, at 102:3–8; *see also id.* at 212:14–22.) Bryce also testified that he never took AEN to an emergency room or hospital in Canada, nor did AEN receive an "annual welfare check." (Trial Tr. Day 1, at 53:5–7.) In Canada, Bryce testified that children receive "welfare check[s]" at two years old and five years old. (Trial Tr. Day 1, at 53:8–11.) Bryce further testified that he never perceived a need to take AEN to a hospital, as "[t]he worst she ever had was a cold." (Trial Tr. Day 1, at 56:14.)

Although AEN received her initial vaccinations in Virginia, Bryce testified that Nina would not provide him with AEN's immunization records. Because AEN had to have proof of vaccination to be registered for school, Bryce testified that AEN had to receive all of her vaccinations again to go to school. (*See* Pet'r Ex. 46.) Bryce also treated AEN for a wart on her foot while she was in Canada. (*See* Pet'r Ex. 18 (picture of Dr. Scholl's wart remover).)

## F.    Relationship Between Nina and Bryce Further Deteriorates

In August of 2016, Nina contacted the FBI to report Bryce for kidnapping, because he had not returned AEN to her. Nina testified that she heard "nothing whatsoever" for "[a]

17

couple months" after Bryce took AEN to Canada. (Trial Tr. Day 2, at 154:18–155:6.) This

testimony was false. Respondent's Exhibit 1 contains the parties' text message conversations

between March and late June 2017, including Bryce texting pictures of AEN to Nina. Many

of these text conversations contain alarming statements, and they are too numerous to include

here in full. (*See also* Pet'r Exs. 32–34.) Nevertheless, the court includes the following text

messages from November 8, 2017. (Pet'r Ex 34.) There is no "conversation," per se; rather,

Nina sent the following stream of text messages to Bryce:

> Two heavy battleships are in play now. Dont even need a lawyer
> for your crimes. . . . Youre a joke. Storm is coming. Getting
> completely dark. You will rnd up in the US prison at the end of
> this. [AEN] will never be allowed outside the US until shes 18
> because of your stunt. And no thats not me doing that. It will be
> the courts and judge. Not me.
>
> . . . . U.S. department of state . . is coming for you as well as the
> [C]anadian authorities. Just sit back and watch. I warned you time
> and time again. Its completely out of my hands now. Good luck
> with youre punishment. Looking at at least 3 years. And yes its
> an extradition charge. No hiding from that. Good bye military
> career.
>
> . . . . Oh and btw if I die. The information/evidence is already out
> there. Winner winner chicken dinner. So go ahead and try to hire
> someone to kill me off. We are fully aware of what you/your
> family could be capable of. Like I stated. Out of my hands.
>
> . . . . You caught me at a weak point in life. But Ive had to deal
> with worse. Thank you. But I will make you suffer for child
> abusing my daughter. Trust me. Eyes are on you. If you hurt mt
> daughter . . you will face charges. . . . No one can save you
> (meaning the military). Basically a shot thru the heart. If you ever
> actually loved me. . . you would answer the phone. i would not
> use it against you. Note. My words. I already have too much
> evidence against you. I wanted you in her life but you are not the
> person I ever thought you were.

(Pet'r Ex. 34 [*sic* throughout].) Then, several weeks later on November 22, 2017, Nina wrote:

> I love you! I love my daughter [AEN]!! I wish you wouldnt have done this to "OUR" family!!!! I want my family back Bryce!!!!!! Give her hugs and kisses from me Nina Nowlan her real mother and not your side piece trying to fill in for me. Did you ever stop to wonder if she truly cares about [AEN] and not abusing her when you are not looking?!?!?!? We dont know this person. Give me my daughter that you have internationally parental kidnapped by her father to [C]anada.

(*Id.* [*sic* throughout].) Moreover, Nina called Bryce's senior officers and told them that she reported him to the FBI. Bryce asserts that because of Nina's "harassment"—and at the suggestion of the military police—he eventually blocked Nina's phone number. (*See* Resp't Ex. 5 ¶¶ 59–60.)

## G.     Canadian Custody Proceeding

On November 30, 2017, Bryce initiated proceedings in the Superior Court of Justice, Family Court Branch in Pembroke, Ontario, Canada ("Canadian Custody Proceeding"), seeking divorce, sole custody, and child support.

## H.     JDR Proceeding

Several months later, on January 24, 2018, Nina filed a competing petition for custody in the Juvenile and Domestic Relations Court in Augusta County, Virginia ("JDR Proceeding").[10] The JDR Court appointed a GAL, Michael Araj, Esq., to represent AEN's interests. On May 11, 2018, after an evidentiary hearing, the JDR Court entered an order finding that (1) it had jurisdiction over the petition for custody under Virginia law because AEN was removed from Virginia on a temporary basis and, accordingly, Virginia was AEN's

---

[10] Case No. JJ034660-01-00. The court requested the records from the JDR Proceeding. They were subsequently filed under seal on this court's docket on January 11, 2021. (ECF No. 36-1.)

"home state" within six months of the filing of the petition for custody[11]; and (2) Bryce's

retention of AEN was wrongful within Article 3 of the Hague Convention. (Resp't Ex. 2.) It

is unclear whether Bryce received formal service of process for the JDR proceeding. In any

event, Bryce became aware of the proceeding at some point because there is correspondence

between Mr. Araj and Bryce's attorneys. (*See* ECF No. 36-1 at 158 (letter from Jeanette

Songolo, Bryce's former attorney, informing Mr. Araj that Bryce had never been served with

any court papers in the JDR Proceeding, and that "he does not accept that Virginia is the

correct jurisdiction for dealing with custody for [AEN,] nor does he wish to in any way attorn

to the jurisdiction of Virginia."); *see also* ECF No. 36-1 at 41 (email from Allan Hirsch, Bryce's

former attorney, stating that "Bryce is not inclined to file an answer to the Virginia application

or to address the merits of that case at this time because he does not wish to attorn to your

jurisdiction.").) Bryce never formally appeared in the JDR Proceeding.

In September 2018, the GAL brought a motion to dismiss on the basis, among others,

that "the minor child's best interests are protected by the Canadian court's involvement, and

that such proceedings would afford each party an opportunity to be heard." (ECF No. 36-1 at

---

[11] Under Virginia law (as well as the law of every state in the United States except for Massachusetts), the
Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), Va. Code Ann. § 20-146.1, *et seq.*,
applies in cases where multiple states or foreign countries have potential initial jurisdiction over a child custody
matter. The UCCJEA allows a court to assert jurisdiction over a child custody matter in several circumstances.
Relevant here, a Virginia court has jurisdiction over an initial custody determination "only if":

> This Commonwealth is the home state of the child on the date of the
> commencement of the proceeding, or was the home state of the child within
> six months before the commencement of the proceeding and the child is
> absent from this Commonwealth but a parent . . . continues to live in this
> Commonwealth.

Va. Code Ann. § 20-146.12. The UCCJEA defines the "home state" as "the state in which a child lived with a
parent . . . for at least six consecutive months immediately before the commencement of a child custody
proceeding." *Id.* § 20-146.1.

53.) The GAL's position was that "the vast majority of evidence to determine the best interest of the child is in Canada, making it a more appropriate venue." (*Id.*) This motion was pending when Nina filed her own Hague Petition in Canada (discussed below).

**I.     Bryce's Mental Health and Visit to Canadian Hospital**

In early February 2018, Bryce discovered the body of his friend who had committed suicide. The circumstances were horrific and need not be elaborated upon here. It was difficult for Bryce to testify about the details, and it is apparent that he suffered mental health consequences as a result. At that point in time, Bryce was still dating Ms. Guenther.

In May 2018, Ms. Guenther called Kristie-Lee Penman, their mutual friend, and asked Ms. Penman to come over and talk to Bryce. Ms. Guenther had just broken up with Bryce. Ms. Penman went to Bryce's house and found him sitting in the living room and "clearly upset." (Trial Tr. Day 2, at 12:14.) Ms. Guenther was still at the house, and AEN was playing in the living room. Ms. Penman and Bryce had a conversation on the couch. She ultimately called the paramedics because "Bryce had a bit to drink and his emotional state was further than I could have handled at that time, and it was getting on, so I decided the paramedics would be the best people to handle the situation at the time." (Trial Tr. Day 2, at 13:1–4.) The paramedics took Bryce to the hospital. Ms. Penman took AEN to her home, where AEN stayed for approximately two days.

According to Ms. Penman and the hospital records, Bryce was drunk and suicidal, but never made a suicide attempt. (Pet'r Ex. 48.) He reported drinking 12 beers in two hours, and he wrote a suicide note, which he had given to Ms. Penman. He planned to hang himself. The following day, Bryce's medical records note that he was embarrassed about the situation. After

he was discharged, Bryce self-reported to "Warrior Support." Bryce testified that he is no longer seeking mental-health counseling related to the suicide of his friend, or for any other reason.

## J.      Canadian Hague Proceeding

In early March 2019,[12] Nina filed a Hague Convention petition in the Superior Court of Justice, Family Court Branch in Pembroke, Ontario, seeking the return of AEN to Virginia ("Canadian Hague Proceeding").[13] As a result of that proceeding, the Canadian Custody Proceeding was stayed.  In the Canadian Hague Proceeding, Bryce did "not dispute that the child's habitual residence was the State of Virginia and that her retention in Ontario since July 1, 2017 is technically wrongful." (Pet'r Ex. 4 ¶ 2; *see also* Resp't Ex. 5 ¶ 3.) Bryce contended that he "acted in good faith and in compliance with the recommendations of the Child Protective Services in Virginia." (Resp't Ex. 5 ¶ 3.) Because Nina filed the petition more than a year after AEN's allegedly wrongful retention in July 2017, Bryce brought the "now-settled" defense under Article 12 of the Hague Convention. In an opinion dated August 13, 2019, the Honorable Madame Justice M. Fraser found that the "now-settled" defense applied and that

---

[12] In Respondent's Exhibit 4, which contains Nina's Canadian Hague petition, there is a "Notice of Motion" signed and dated by Nina's attorney on March 4, 2019, but it is date-stamped on March 6, 2019. It also appears that Bryce was served on March 5, 2019. The court is unaware of the exact date of the filing.

[13] The records before the court show that Nina signed and dated a Hague Convention *application* on March 25, 2018 (approximately one year prior). (*See* Resp't Ex. 1.) It is not clear when Nina actually submitted her application to the United States Department of State. The application, however, "was received by" the Department of State on April 11, 2018, and it was forwarded to the Canadian Central Authority that same day. (*See* Resp't Ex. 3 (letter from Department of State to Nina).) The Canadian Central Authority approved and opened the file on May 11, 2018. Nina submitted a request for legal assistance to the Ontario Legal Aid Society through the Canadian Central Authority in May 2018, but she was rejected under the financial eligibility guidelines. Nina apparently tried to retain counsel, but had trouble finding a lawyer that she could afford. Nina eventually hired an attorney in Canada to represent her in November of 2018. Her attorney then officially filed the petition in court in March 2019. (*See* Resp't Ex. 4.)

AEN should remain in Canada. (Pet'r Ex. 4.) As to AEN's life in Canada, Justice Fraser found:

> The child is currently four years, seven months old.[14] Since April 1, 2017 (a span of two years, four months), she has resided exclusively with her father in Petawawa, Ontario. She has her own room. When her father is working, she attends a private daycare. The father has been attending to her daily needs: making meals, organizing or hosting play dates with other children, reading to her every night, playing games, watching movies, bathing her. He involves her in outdoor activities, including skating and sliding in the winter, camping and walking nature trails in the summer, and taking daily evening walks with their dog. The father has brought her to spend time with his family in New Brunswick. The paternal relatives maintain contact with the child via FaceTime.

(*Id.* ¶ 31.) In her analysis of the now-settled defense, Justice Fraser made the following

conclusions:

> The greatest factor relevant to this case to the determination of whether the child has settled into her environment is the security and stability of the environment she now finds herself in with her father. This environment was not present in the child's life when she was residing with the mother. The first years of the child's life appear to have been visited with conflict and challenges owing to the mother's relationship issues with the father and the maternal grandmother, and her struggles with mental health and substance abuse issues.
>
> While the father as an "abductor" should not be able to benefit from the fact that the past two years has resulted in the child becoming "attached" to him, when approaching the consideration of this issue of settlement from a child's perspective, I conclude that the child is being provided with the security and stability she was missing in her earlier years. I conclude that the child has settled into her environment.

---

[14] The Canadian Hague Court was mistaken as to AEN's age. At the time this opinion was issued, AEN was only three years, nine months old. The court's calculation about how long AEN had resided in Canada, however, is accurate. AEN was born in November 2015, and Bryce picked her up from Virginia in April 2017. She was approximately one-and-a-half years old at that time. In August of 2019, AEN had lived in Canada for approximately two years and four months.

> There is little question that if the child is sent back to Virginia,
> where she has not been for two years, that this would cause
> disruption and potential emotional trauma to her.

(*Id.* ¶¶ 51–53.) Justice Fraser dismissed Nina's Hague petition, thereby allowing the Canadian

Custody Proceeding to continue. In her order awarding $10,000 to Bryce for costs incurred in

the Canadian Hague Proceeding, Justice Fraser noted that "the undisputed finding was made

that the child was wrongfully detained in Canada by him." (Resp't Ex. 8.)

## K.   Canadian Custody Proceeding Continues and Nina Spends Time in Canada

On December 12, 2019, the Canadian Custody Court held a case conference. Nina

appeared by phone. The court entered a temporary order entitling Nina to two Skype calls

with AEN per week, as well as a Skype call on Christmas day. (Pet'r Exs. 6–7.) In 2020, Nina

was able to appear in person and participate in the Canadian Custody Proceeding after a

Canadian border-patrol agent allowed her into Canada. (*See* Pet'r Ex. 9 (February 6, 2020 court

order indicating that Nina was "present in person").) Nina spent time in Canada between

February 6–8, 2020, and she was able to see AEN. The Canadian Custody Court held a case

conference on February 6, 2020, and it entered a "temporary [without] prejudice order"

following the conference. (Pet'r Ex. 8 (handwritten order); Pet'r Ex. 9 (typed order).) Relevant

here, the order required:

> iv.   In addition to the regular skype access set out in the
> interim order dated December 12th 2019 the respondent
> will visit with [AEN] on Thursday February 6th 2020
> between 4.30 and 6.30 p.m. at Boston Pizza in Petawawa
> and on Saturday February 8th 2020 between noon and 4.00
> p.m. at Dundonald Hall, Petawawa. Only [AEN] and the
> applicant and the respondent shall be present for these
> visits.

    v.        **[AEN]'s passport will be given to the applicant's counsel to hold until further order of this court.**

    vi.       **[AEN] shall not be removed from Canada by the mother without a further order of this court or by written agreement between the parties.**

. . . .

    viii.    The parties may set up such further access as [is] mutually agreeable to them.

(Pet'r Ex. 9 (emphasis added).) Also on February 6, Nina testified that AEN pointed out that she had vaginal irritation in a restaurant bathroom. Nina told Bryce about it. On February 8, Nina texted Bryce and asked if he had gotten AEN's "yeast infection and warts cared for." (Pet'r Ex. 14.)

According to the GAL Report, Bryce was not aware that AEN had issues urinating on February 8, 2020. (ECF No. 58 at 18.) He said he first became aware of the issue on February 11, when AEN told him. (*Id.*) On that same day, Bryce went to the pharmacist and picked up Canesten cream (an antifungal medication) for AEN. (*See* Pet'r Ex. 16 (screenshot of purchase from "Shopper's Drug Mart Petaw[awa]" for $43.91); *see also* Pet'r Ex. 17 (picture of Canesten cream).) The GAL Report also states that when AEN shared the concern with him, he consulted his neighbor and friend, Ms. Kate Kilgore. (ECF No. 58 at 18.) Ms. Kilgore did not testify at trial, but she confirmed with the GAL during an interview that Bryce spoke to her about AEN's health concern. (*Id.*) Ms. Kilgore and Bryce also "reported [to the GAL] that [AEN] had a history of not wiping herself properly after using the bathroom." (*Id.*) Ms. Kilgore advised Bryce that it was probably a yeast infection. (*See id.*) Bryce told the GAL that "he applied the Canesten to [AEN's] vagina with a piece of toilet paper in the morning, after

school, and before bed." (*Id.* at 19.) He also reported that AEN "did not mention that the issues persisted and [he] thought the problem was rectified." (*Id.*)

On February 18, 2020, Nina and Ms. Brown returned to Canada, and they were able to have additional visits with AEN. That day, she texted Bryce the following:

> You are about to leave for 3 months Bryce. I would like for you to allow me to have her while you are gone. I have as much right as you do Bryce. Only you decided to take my rights away. I will come up and finish the court proceedings with you when you return from training and all documents are submitted.

(Pet'r Ex. 14.)

On February 19, 2020, Nina texted Bryce, "[Y]ou need to take her to the doctor to get her vagina looked at. It's bad and not good." (*Id.*) Nina also asked if AEN had a health card, and later stated that AEN "needs to get her vagina checked." (*Id.*) On February 20, 2020, AEN stayed overnight with Nina and Ms. Brown at their hotel. Nina testified that this is when she "noticed [AEN's] vagina's irritation was extremely bad." (Trial Tr. Day 2, 173:10–11.) She thought that it was "worse," and that it "was red, raw, surrounding the entire vulva," and that "[i]t looked very painful." (Trial Tr. Day 2, at 174:1–5.) Nina also testified that AEN was only in pain and crying when she went to the bathroom, but that she was otherwise fine and acting normally. (Trial Tr. Day 2, at 174:2–5; *id.* at 207:4–7.) AEN was constipated, but she was ultimately able to defecate. Ms. Brown testified that "[AEN] had a big rub rash on her vagina. Really bad." (Trial Tr. Day 2, at 48:23.)

Nina went to the pharmacy in Canada and got some Desitin cream (a zinc oxide cream for diaper rash) for the infection and/or irritation. When Bryce came to pick up AEN on February 21, Nina told him that the cream was in AEN's bag. When Bryce dropped off AEN

for another visit with Nina later that day, Nina and Ms. Brown took AEN to an emergency room. (*See* Resp't Ex. 9.) AEN was not in that emergency room's system, and the staff recommended that Nina come back with AEN's health card. AEN did not receive care from that emergency room. According to the GAL report, Nina and Ms. Brown "believed this to mean that [AEN] never received medical care during the entire time she was in Canada." (ECF No. 58 at 17.) Ms. Brown testified that they returned to their hotel, and "just kept putting stuff on it, you know." (Trial Tr. Day 2, at 53:13.) According to the GAL Report, Bryce "stated that he was not aware that the Minor Child still had redness, painful urination/bowel movements on or about February 22, 2020." (ECF No. 58 at 19.)

On February 22, 2020, Nina had an additional visit with AEN before she was supposed to return to Virginia. Bryce dropped AEN off at approximately 11:00 a.m. According to Nina, when she and Bryce were discussing what time Bryce would pick up AEN, Bryce told her 3:00 p.m. and indicated that he would be driving to New Brunswick, where his parents live. Nina understood that Bryce had a training exercise in Borden for at least three months, and that AEN would be living with his parents in New Brunswick.

**L.     Nina Takes AEN to Virginia**

When Bryce went to pick up AEN that afternoon, Nina and AEN were not there to meet him. Nina testified that, "[o]n February 22 I didn't return her back to Bryce." (Trial Tr. Day 2, at 178:14.) Nina never returned AEN to Bryce; rather, on February 23, 2020, Nina took AEN to her home in Virginia, where she remains to this day. (Pet'r Ex. 41.) Bryce did not consent to AEN's removal from Canada.

When asked at trial, Nina testified:

> I was afraid of her safety, and I panicked, and I knew she wasn't in the health care system. I knew that her vagina irritation was getting worse, not better. She also told me that Daddy does bad stuff. I asked her, well, what kind of bad stuff? And she said that Daddy made her drink beer, but in my gut feeling that—there was more. A child wouldn't just say "my daddy does bad stuff to me."

(Trial Tr. Day 2, at 179:24–180:5.) Nina also testified that she "figured [AEN] was being neglected." (Trial Tr. Day 2, at 183:25.) According to the GAL Report, Nina and Ms. Brown decided to bring AEN to the United States "for medical treatment." (ECF No. 58 at 17.) Nina confirmed at trial that AEN did not make any statements indicating sexual abuse in Canada. (Trial Tr. Day 2, at 180:6–8.) Nina contacted an FBI agent in Virginia and advised him that she removed AEN from Canada. (*See* Trial Tr. Day 2, at 180:23–25; *id.* at 181:11–18.) She testified that she contacted the FBI because of her concerns about AEN's well-being in Canada. (*See* Trial Tr. Day 2, at 184:11–17.) As discussed below, the FBI set up a forensic examination with AEN. Nina expressly testified at trial that prior to the first forensic examination with the FBI on March 11, 2020, AEN had not made any statements indicating sexual abuse. (*See* Trial Tr. Day 2, at 184:11–25.)

On March 10, 2020, Bryce appeared before the Canadian Custody Court. Nina did not appear for this hearing. The court entered its third temporary order, ordering Nina to immediately return AEN to Bryce in Canada and granting Bryce "interim sole custody." (Pet'r Ex. 21 ¶¶ 2–3.) The court further ordered:

> [A]ll police services (including but not limited to the MP, the
> OPP, the RCMP, the US State and County Police, US Sheriff's
> Offices, and the FBI) having jurisdiction in any area where it
> appears that [AEN] may be, shall locate, apprehend and deliver
> [AEN] to her father Bryce Nowlan. Further, for the purposes of
> locating and apprehending [AEN] members of all police services
> (including but not limited to the MP, the OPP, the RCMP, the
> US State and County Police, US Sheriff's Offices and the FBI)
> may enter and search any place where he or she believes that
> [AEN] may be, with such assistance and such force as are
> reasonable in the circumstances and such entry may be made at
> any time.

(*Id.* ¶ 5.) The Canadian Custody Court sent that order to the Virginia JDR Court. (*See id.* ¶ 6.)

## M.    Facts Surrounding Possible Sexual Abuse

The court again diverges from chronological order to discuss the facts relating to the allegation that Bryce sexually abused AEN, which emerged over a period of months after Nina brought the child back to Virginia.[15]

After Nina brought AEN to Virginia, Nina testified that AEN made a concerning statement "towards the end of March." (Trial Tr. Day 2, at 186:17–18; *see also id.* at 184:1.) Nina testified as follows:

> She was in the bathtub at my apartment. She—she has a bunch
> of toys in there. One was like a little pony; it was like white and
> brown. She—I help her with her hair, but then I, every so often,
> kind of like walk by and just check on her and see how she's
> doing. I gave her—well, I put soap on the loofah for her and
> handed it to her. She can wash herself. She is capable of washing
> herself. She then started washing her body, but then when it got
> down to her vagina she started—she was washing it longer and
> started laughing, like she was rubbing it with the loofah. She said
> it tickled. And I was like don't—"No, you don't do that." That's
> when she states, "Well, my Daddy does it and I like it, but that
> was our secret, but now it's not our secret because I told you."

---

[15] As noted below, Nina has provided different accounts of when she first learned or suspected that Bryce had sexually abused AEN.

. . . .

> I got upset. I told her, "Nope. Nope. No one should touch you.
> No one. Not me, not your daddy, not anybody. No one should
> do that to you. It's wrong. Just—just don't do that." And it
> really—it shocked me, and I was upset that it's happened to her.
> And from my reaction to her, that's why I believe she ended up
> telling my mother before me of the additional stuff."

(Trial Tr. Day 2, at 185:12–186:8.) According to the GAL Report, Nina reported that in the

bathtub, "[AEN] started rubbing her vagina and [she] stated, 'Daddy tickles my vagina.'" (ECF

No. 58 at 35.)

AEN also made several statements to her grandmother. First, in "April or May" of

2020, Ms. Brown testified to the following:

> And she was at my house, and I put her in the bathtub. I put her
> in the bathtub, and I was in the other room, you know, and I
> heard her say "ouch." And I run in there and see what—you
> know, see what's going on. And she said, "Ow." I said, "What
> happened?" She said, "I hurt in"—she was showing me, and I'm
> like, "Your vagina?" And she was like yeah. And I said—and she
> had told me butterfly. And I said, "What happened?" She said,
> "Don't say nothing. We play hide and seek. I stuck the
> unicorn"—and she lift her leg.

(Trial Tr. Day 2, at 64:3–19.) Ms. Brown became upset while testifying. When questioned

about the incident again, her testimony changed slightly:

> When I'm looking at her, I said, "What happened?" And she said
> "I hurt" and she lift her leg all the way up, you know, in the
> bathtub, and she said—I said, "You hurt your vagina?" You
> know. And she said, "Don't say nothing. Me and Daddy play hide
> and seek." And she said, "I stuck the unicorn and scratched it
> because we play hide and seek." And I said, "Did you tell Daddy
> to stop?" And he said, she said, "I closed my eyes." I said,
> "Nobody touches—you know, puts any things in your, you
> know, vagina."

(Trial Tr. Day 2, at 65:25–66:9.) AEN made one other statement to Ms. Brown a few weeks

later. According to Ms. Brown:

> We was downstairs. She was coloring. And my dog, it's a older
> dog, and she peed. And then [AEN] just all the sudden said,
> "Well, I peed on Daddy's face." I'm like, "How can you pee on
> Daddy's face?" And she rolled over and said that he had his face
> and she—he was tickling her right there. And then she said, "He
> had to go take a shower."

(Trial Tr. Day 2, at 66:21–67:1.)

Bryce acknowledged that he had treated AEN's vaginal irritation, but he vehemently

denied that he sexually abused his daughter. First, in October 2018, Bryce asked Ms. Penman,

who is also a nurse, to help check AEN's vaginal area because AEN "complain[ed] that it

burned" and he thought she had a yeast infection. (Trial Tr. Day 1, at 99:17–100:6.) AEN was

almost three years old at the time. Ms. Penman, as well as another friend who was also a nurse,

examined AEN in Ms. Penman's home. The friend and Ms. Penman "both came to the

conclusion that it was likely a yeast infection style of diaper rash." (Trial Tr. Day 2, at 8:25–

9:2.) Ms. Penman advised Bryce to get a cream for AEN. She and Bryce went to the store with

AEN and, after conferring with the pharmacist, Bryce purchased a cream for the yeast

infection. Ms. Penman testified that she followed up with Bryce over the course of a week to

see if it was working. Ms. Penman did not recall Bryce ever asking her to examine AEN again.

Bryce testified that he read the instructions on the packaging, and he brought AEN up

to the bathroom. At that point, he did not think AEN could apply the cream by herself because

she was "too young to know what she'd be doing with it." (Trial Tr. Day 1, at 104:5.) Bryce

testified that he put the cream on a piece of toilet paper and applied the cream to AEN's

vaginal area. He testified that he did not have "concerns" about doing that, and that his bare

31

fingers never touched AEN's vaginal area. (Trial Tr. Day 1, at 104:14–21.)

Second, in 2020 (as discussed above), AEN also had redness and irritation in her vaginal area. Nina and Ms. Brown purchased Desitin cream for AEN in February 2020, and Bryce purchased Canesten cream. At trial, the court had the following colloquy with Bryce:

> **The Court:** How many times did you have to apply the ointment for what's been described as a yeast infection? And you've described using toilet paper and applying that. How many times did you do that?
>
> **Bryce:** It would be in the morning before she went to school, when she returned from school, and that night after her bath.
>
> **The Court:** How many times total do you think you did that?
>
> **Bryce:** I'd say approximately two dozen, maybe more.

(Trial Tr. Day 3, at 118:8–18.) Bryce further testified:

> **Counsel:** How—what period of time was the Canesten required to be used for the complaints to cease?
>
> **Bryce:** Approximately two weeks or until the tube was completed.
>
> **Counsel:** How did you confirm that when the complaints stopped the redness and stinging reasons were no longer there?
>
> **Bryce:** I would check her out when she was in the bath.
>
> **Counsel:** How frequently did your daughter have a bath?
>
> **Bryce:** Every night.

(Trial Tr. Day 1, at 105:3–10.) As noted above, Bryce reported to the GAL that he applied the cream to AEN's vaginal area "with a piece of toilet paper in the morning, after school, and before bed." (ECF No. 58 at 19.)

Bryce testified that he "never" applied or rubbed his fingers on AEN's vaginal area.

(Trial Tr. Day 1, at 104:19–105:2.) Bryce also testified that AEN used "PAW Patrol washcloths," and never loofahs. (Trial Tr. Day 1, at 106:17.) Bryce also testified that he "never" saw AEN playing with her private parts with her own fingers or doing anything resembling masturbation. (Trial Tr. Day 1, at 107:7–12.) Bryce "never" brought AEN into his own bed, and there was a child gate blocking both AEN and their dog from his room. (Trial Tr. Day 1, at 64:11–19; *see also* Trial Tr. Day 2, at 7:2–4 (Kristy-Lee Penman: "[Bryce] always kept [AEN] out of his room. He had a dog, so there was always a baby gate to keep the dog in the room and [AEN] out of the room.").) He also testified that he "never" slept in AEN's bed. (Trial Tr. Day 1, at 95:23–24.) Bryce stated that when he read books to AEN, they did so on the couch downstairs before bed. (Trial Tr. Day 1, at 96:6–9.) Bryce also potty trained AEN in "late 2017 or early 2018." (Trial Tr. Day 1, at 98:3–8.) He testified that AEN never urinated on him by mistake because she "always had a diaper or pull up on." (Trial Tr. Day 1, at 98:12–13.) He taught AEN how to clean herself properly. (Trial Tr. Day 1, at 98:16–24.) Bryce testified, however, that there were occasionally "fecal mistakes," when AEN would defecate in her pull-up. (Trial Tr. Day 1, at 99:1–6.)

According to the expert report from Drs. Fender and Loehrer (discussed below), Bryce

> indicated that he had some general discussions with A.E.N. about not showing her private area to other people and that no one was supposed to touch her genitalia. He indicated that he never told A.E.N. to keep secrets about any of their interactions. He stated that A.E.N. called her private parts her "front bum and back bum." When asked if she ever referred to her vagina by any other name he responded "no." When asked specifically if she ever referred to her vagina as butterfly he responded "no."

> When asked for his thoughts about A.E.N. stating that she peed on his face and hands he indicated that nothing like that had ever happened. When asked his opinion of the reasons the child

33

reportedly made statements that he touched her "vagina" or "butterfly" he responded that he believes Mrs. Nowlan is responsible.

Mr. Nowlan was asked questions about his play interactions with A.E.N. He acknowledged that they played hide and seek. . . . He was then asked about A.E.N's references to stuffies and he stated that those are "her toy teddy bears." He indicated that he has never played with the stuffies around A.E.N.'s vaginal area.

(Court Ex. 1 at 25–26.)

Bryce also testified that he found out about FBI involvement regarding AEN in March of 2020. He stated that Nina never personally told him of her complaint, but that she had "told the court" that AEN was going to undergo an FBI forensic exam. (Trial Tr. Day 1, at 83:9.) Bryce stated that he "was kind of shocked, to be honest." (Trial Tr. Day 1, at 83:19.) Canadian law enforcement agencies advised Bryce not to speak to Nina or AEN. Bryce has therefore not tried to contact AEN since Nina took her to Virginia. Bryce also testified that he was never contacted by anyone in the United States regarding a forensic examination of AEN. (Trial Tr. Day 1, at 107:3–6.)

**N.    AEN's Medical Treatment in the United States**

Upon returning to Virginia, Nina took AEN to several medical professionals. The court notes, however, that even though Nina described AEN as in pain—indeed, Nina testified that AEN's medical "neglect" was *the* reason she removed AEN from Canada—there is no record of AEN being taken to an emergency room in the United States immediately upon her arrival. According to the medical records before the court, AEN did not have an appointment with a medical doctor until approximately one month after she was taken from Canada. According to the GAL Report, Nina confirmed that she did not take AEN to a doctor immediately upon

34

arrival to the United States. (ECF No. 58 at 17 ("Mother stated that the Minor Child's return was a 'whirlwind,' and she made appointments with the [FBI] to do an interview of the Minor Child regarding the international kidnapping matter.").) She informed the GAL that AEN's vaginal irritation went away with regular application of the Desitin cream. (*See id.* at 18.)

On March 11, 2020, AEN met with Jodie Hively, a mental health counselor/therapist who performs child sexual abuse assessments for the FBI.[16] The interview was conducted at the Shenandoah Advocacy Center. After the first session with AEN, Ms. Hively apparently recommended that Nina seek play therapy for AEN.

The second appointment was approximately one month after AEN returned to Virginia. On March 18, 2020, AEN had a "Well Child" appointment with a pediatric doctor, Dr. Evan Karp, within the University of Virginia Health System ("UVA"). (Pet'r Ex. 24.) The medical records from this appointment note that a "[f]orensic evalution was done last week by Shenandoah Advocacy [C]enter." (*Id.*) The records also contain the following note: "Due to the history of parental separation and abduction, mom will be enrolling her daughter in play therapy and there may be a need for psychiatry in the future." (*Id.*) There is no mention of sexual abuse or anything else out of the ordinary. It appears that AEN was in good health. It also appears that Nina did not address AEN's vaginal irritation at this appointment.

On April 14 and 28, 2020, AEN had two telehealth visits with Alana Martinez, a "Resident in Counseling" at the Valley Community Services Board. (*See* Pet'r Ex. 45.) There

---

[16] AEN did not disclose anything out of the ordinary in this session. Ms. Hively also interviewed AEN on January 8, 2021. During that second session, AEN made statements consistent with what she said to her play therapist, Laurie Thomas, discussed below. The two sessions with Ms. Hively were recorded, and the court has seen both videos. For reasons thoroughly explained on the record, the court excluded the "FBI videos," thereby sustaining Petitioner's objection to Respondent's Exhibit 13. (*See* Trial Tr. Day 2, at 108:13–116:17.) The court has attached the transcript of its oral ruling as Exhibit A.

is no mention of sexual abuse in the medical record. Rather, the stated purpose of the appointments was to help with AEN's separation anxiety and to "cope with the trauma that [AEN] experienced while with her dad in Canada." (*Id.*) According to Nina's answers to interrogatories, after the telehealth calls with Ms. Martinez, Nina switched to Laurie Thomas, a registered play therapist and licensed clinical social worker, because she worked with children in person during the Covid-19 pandemic. (*See* Pet'r Ex. 40.)

On May 17, 2020—approximately three months after AEN's removal from Canada—Nina took AEN to the Augusta Health Medical Center for a "Sexual Assault Nurse Examiner" ("SANE") exam. (Pet'r Ex. 47.) Ms. Brown testified that this exam was scheduled after AEN's first statement to her while in the bathtub. (Trial Tr. Day 2, at 77:12–21.)[17] In the medical record, under the heading "Patient Stated Complaint," it states:

> [Patient] carried to intake c/o "she needs an exam." [Patient's] mother reports 1 [previous] exam and "play therapy was recommended." Last night [patient stayed] at grandmother's [house] and "more information was disclosed." [Patient's] mother reports FBI was contacted and recommended [patient] get a second exam.

(*Id.*) Under the "Social History" heading, it states: "Abuse, Neglect or Violence: Denies." (*Id.*) Nina was present for the SANE examination, and she testified that the nurse took photos. She also testified that the SANE examination lasted "over an hour." (Trial Tr. Day 2, at 225:14.) Nina testified that the SANE nurse was going to look at the pictures and prepare a report, but that she never heard from the SANE team again or received a report. Oddly, there is no

---

[17] Ms. Brown could not remember whether AEN's statements were in April or May. This confirms that AEN's second "bathtub" statement was likely in May 2020.

information in the medical record about the conclusion of the SANE exam. To Nina's knowledge, the SANE nurse did not discover any physical injuries. (*See* Pet'r Ex. 40.)

## O.    Play Therapy with Laurie Thomas[18]

Between June 8, 2020 and December 18, 2020, AEN went to 43 play therapy sessions with Laurie Thomas. Each session was 45 minutes. The court has reviewed the records from Ms. Thomas's therapeutic treatment of AEN. The court outlines AEN's statements, as well as any other concerning behavior contained in the records:

- June 8, 2020: "During her play [AEN] stated, 'I don't want to go to live with my daddy.'"

- July 2, 2020: "[AEN] refused a prompt of doing a sandtray to represent Canada, stating she 'doesn't want to go back and her Daddy is bad.' [AEN] does not like to mention her Daddy during play and she continues to say 'he is a bad man.' Upon further exploration, [AEN] disclosed that her daddy would touch/tickle her 'butterfly' (pointing to her vaginal area)."

- July 3, 2020: "[AEN] told Mr. Swortzel [the GAL] that she 'did not want to live with her Daddy' and 'she did not want to see her Daddy' when questioned. She also used toy dolls to show Mr. Swortzel where her Daddy touched her (indicating her genital area using the word 'butterfly'). With encouragement she was able to color a picture ([on] which I had drawn the outline of a human body), of the 'bathing suit areas.' She also colored the female genitalia with pink marker stating that this is her butterfly area and that 'daddy touches her butterfly.'" There is a picture attached, with the outline of a human, and the following words written by Ms. Thomas: "Neck," "Belly," "Butterfly," and "Daddy touched my 'Butterfly.'"

---

[18] Respondent called Ms. Thomas as both a fact witness and an expert witness. Ms. Thomas did not give live testimony during the bench trial; rather, the court reviewed her *de bene esse* deposition. In a detailed oral ruling, the court granted Petitioner's motion *in limine* (ECF No. 63) and excluded Ms. Thomas as an expert witness under Federal Rule of Evidence 702, and it will therefore not revisit that issue here. (*See* Trial Tr. Day 3, 89:24–96:24.) The court has attached the transcript of its oral ruling as Exhibit B. The court, however, will analyze the materials from Ms. Thomas, to the extent that they report *factual* information regarding AEN's therapy. (*See* Trial Tr. Day 3, at 95:15–96:24.) Petitioner's counsel agreed that AEN's various statements to Ms. Thomas are admissible under Federal Rule of Evidence 803(4)(A). (*See* Trial Tr. Day 1, at 242:14–243:8.) The court notes that Petitioner's objections to Respondent's Exhibits 11, 12, and 15 are sustained to the extent that they include expert opinions, and overruled to the extent that they contain factual material.

- July 22, 2020: "Ms. Nowlan reported that [AEN] had a bowel movement in the bathtub, picked up the feces and smeared it on the walls and then on Ms. Nowlan."

- August 10, 2020: "[AEN] used Playmobil using the police who are chasing bad men and getting them away from the children and moms."

- August 26, 2020: "I asked [AEN] if she wanted to speak with her Daddy via Skype or go see him in Canada sometime? She replied, 'No my daddy is a bad man' further stating, 'my daddy hurt me.'"

- October 20, 2020: "[Notable] in this play is that [AEN] locked herself (small unicorn image) in the wooden closet. She stated 'I am hiding from my daddy. He is a bad man.'"

- October 21, 2020: "[AEN] engaged in playing with paint today after reading 'Do You Have a Secret?['] for Bibliotherapy. . . . [AEN] then painted a picture of she and her father, Bryce sleeping in his bed in Canada. After she painted the picture she explained to me her painting which I annotated on the picture as she told me. [AEN] does not feel safe living with her father in Canada. She further stated to me, 'I never want to go back there and live,' and 'My daddy is a bad person.'" The attached picture contains words written by Ms. Thomas: "red ball," "stars," "my arms," "I don't want to live with my daddy," "I don't feel safe with my daddy," "me," "my pee," "he puts stuffies in my private parts, when I sleep," "I sleep with my daddy," "I peed in his face. He was looking at it," and "I peed on Daddy's hand when he tickled my vagina."

- Another picture (date unknown) has the following words, written in Ms. Thomas's handwriting: "Daddy's Bed," "Daddy tickles my vagina at night when I am in bed with him," and "[AEN] peed on my Daddy's hand." (It is not clear to the court whether the latter statement was a quote, or perhaps the child was speaking in third person.) On another picture from the same day, the handwriting states, "My Daddy touches my private areas." On the back of the picture, it states, "My daddy put my unicorn stuffie in my private areas when I was sleeping" and "I always slept with my daddy in his bed" and "My bed had too many stuffies on it."

(Resp't Ex. 11.)

## P.    JDR Proceeding Reconvenes

In the meantime, the JDR Proceeding in Virginia had been continued multiple times because of the litigation in Canada. On March 12, 2020 (approximately three weeks after Nina brought AEN to Virginia), the GAL in the JDR Proceeding, Mr. Araj, filed a motion for an

emergency hearing. (ECF No. 36-1 at 46.) Mr. Araj informed the JDR Court about the outcome of the Canadian Hague Proceeding and that AEN had since been "abducted." (*Id.*) Further, the motion states: "On Monday, March 9, 2020, the guardian ad litem's office was contacted by [Sheriff] Donald Smith and was informed that [Nina] had come and confessed to abducting the child from Canada despite a valid order from the Canadian Court expressly forbidding any removal of the minor child from said country." (*Id.*)

In a letter opinion, the presiding judge held as follows:

> This Court is required to give full faith and credit to orders issued by other tribunals, whether they be in other states or as in this case, another country. The Canadian Court has asserted jurisdiction over these matters and has entered orders regarding the same. While this Court may have originally been the most appropriate forum to litigate custody and visitation matters it isn't any longer. [AEN] has been in Canada since April 1, 2017, a period of just under three years. It is noted that Ms. Nowlan originally consented to the father taking the child to Canada. There was no end date put on the consent that was given. There was considerable delay in Ms. Nowlan filing pleadings in Canada. The child has been there since April 2017 but as of the end of February 2019 nothing had been filed on her behalf—a period of two years having expired at that time. [AEN] is four years of age; she will be five in November. Accordingly she has now lived in Canada for more than half her life. All information regarding her life, her health, and her education exists in Canada. Ms. Nowlan has participated in the proceedings in Canada. Mr. Nowlan, however, has never submitted himself to the jurisdiction of this Court. Based upon the foregoing, this Court is declining to exercise jurisdiction and finds specifically that Canada is the more appropriate forum for the litigation of custody and visitation matters involving the above-named child.

(ECF No. 36-1 at 2.) The JDR Court dismissed the case on March 20, 2020.

**Q.     Appeal to Virginia Circuit Court**

On April 3, 2020, Nina filed an appeal in the Circuit Court for Augusta County, Virginia, seeking *de novo* review of the JDR Court's dismissal ("Circuit Court Proceeding").[19] On April 21, 2020, Nina filed a motion to retain jurisdiction. On June 1, 2020, the circuit court appointed Eric Swortzel as the new GAL for AEN.

The presiding judge granted the motion to retain jurisdiction on July 28, 2020. (Resp't Ex. 17.) Specifically, the court found that Virginia had jurisdiction under the UCCJEA. (*Id.* at 5–7; *see also supra* note 11.) The court further found that Virginia was not an inconvenient forum, as AEN was again living in the Commonwealth. (Resp't Ex. 17 at 7–10.)

It is appropriate to examine some of the underlying facts upon which the Virginia Circuit Court based its opinion. In the court's analysis of the "home state" under the UCCJEA, the court noted the following:

> [T]he parties' child resided in Canada with [Bryce] under his exclusive care between April 2017 and February 2020, including on the date that [Nina] filed her original custody and visitation petition with the [JDR Court]. Per agreement between the parties on March 30, 2017, the parties' child was removed from Virginia to Canada on April 1, 2017 by [Bryce] *on a temporary basis and was to be returned to Virginia by July 2017. However, [Bryce] declined to do so and retained the parties' child in Canada despite [Nina's] repeated requests to return the parties' child to Virginia.* In February 2020, [Nina] and the maternal grandmother traveled to Canada to see the parties' child. *Upon discovery of an infection of the child's genitals and under suspicion of potential sexual abuse,* [Nina] and the maternal grandmother brought the parties' child from Canada to Virginia, where she resides to present day.

(*Id.* at 6 (emphasis added).) Further, when the presiding judge examined the appropriate forum,

---

[19] Case No. CJ20000013-00. The court requested the records from the Circuit Court proceeding. They were subsequently filed under seal on this court's docket on January 11, 2021. (ECF Nos. 36-2, 36-3, and 36-4.)

40

he found:

> During the July 6, 2020 hearing before this Court, [Nina] and the
> maternal grandmother testified under oath that when visiting the
> parties' child in Canada in February 2020, the parties child
> suffered from an infection of her genitals and that it was painful
> for her to urinate or defecate. The parties' child was refused
> treatment because she was not in the Canadian health system
> when [Nina] and the maternal grandmother attempted to have
> her treated at a Canadian hospital emergency room. *Furthermore,
> the condition and actions of the parties' child indicated potential sexual abuse.
> As a result, [Nina] returned with the parties' child to Virginia and arranged
> for her treatment in Virginia.* Lori [*sic*] Thomas, a Virginia-based child
> counsellor for the parties' child and witness for [Nina], also
> testified under oath that the parties' child suffered from potential
> Post-Traumatic Stress Disorder, trauma, *and abuse while in [Bryce's]
> care.* The Guardian *ad litem* was present when the parties' child
> revealed to the child counsellor in June 2020 that [Bryce] has
> inappropriately touched her.

(*Id.* at 10.)[20]

## R.    Report from Drs. Fender and Loehrer

As noted above, after the first two-and-a-half days of trial, the court discussed

appointing an independent expert under Federal Rule of Evidence 706 with the parties.[21] With

the parties' consent, the court appointed Dr. Keith Fender and Dr. Rebecca Loehrer, of Blue

---

[20] The above-emphasized statements illustrate why adversarial proceedings are highly preferable to one-sided
proceedings, particularly where the determinative issue involves an allegation that the absent party—in this case
a parent—sexually abused his child, unquestionably one of the most serious accusations imaginable. Bryce did
not (and has not) entered an appearance in either Virginia custody proceeding (either in the JDR Court or
Circuit Court). As such, those courts did not have the benefit of having that allegation tested against conflicting
testimony and evidence, including the vast record that this court has been able to comb through to obtain a full
picture of the underlying facts. Further, those courts did not have the ability to make a credibility determination
as to both parents, as this court has. As discussed below, the Virginia Circuit Court had to make a decision, at
least in part, based on "facts" that are at least partially inaccurate, and equally important, vehemently contested.

[21] The court determined that it needed to appoint an independent expert due, in large part, to the glaring biases
and deficiencies in the play therapist's methodology and purported expert opinions, as well as the rebuttal
expert's failure to conduct his own evaluation. (*See* ECF No. 74.)

Ridge Counseling, LLC, to review the record, interview the parties, and conduct an independent evaluation of the sexual-abuse allegations. (ECF No. 74.) The order required Drs. Fender and Loehrer to prepare a report "outlining the evidence, their opinions about the child, and, if possible based on the evidence and their evaluations, an opinion on the probability or likelihood that the child has been the victim of sexual abuse and/or, if the child is ordered returned to the Petitioner, the probability that she will be subjected to sexual abuse by the Petitioner in the future." (*Id.* at 2.)

Drs. Fender and Loehrer reviewed the record in this matter and all other documents provided by the parties; interviewed Nina, Bryce, AEN, and then AEN with Ms. Brown present; and reviewed the *de bene esse* deposition from Ms. Thomas. "Dr. Loehrer and Dr. Fender reached independent conclusions after analysis and subsequently met to discuss the findings." (Court Ex. 1 at 35.) Drs. Fender and Loehrer submitted their thorough, 40-page report to the court, and it was docketed under seal on April 21, 2021. (ECF No. 81.)[22] The court will not reiterate the entire report here; rather, the court will discuss several important findings from the interviews with the parties, as well as Dr. Fender's and Dr. Loehrer's conclusions.

The court first notes that there is an inconsistency between Nina's testimony and what she reported to Drs. Fender and Loehrer in her interview. The report contains the following notes from Nina's interview:

> Mrs. Nowlan was asked when she first suspected th[at] A.E.N. had been sexually abused by Mr. Nowlan and she responded, "February twenty-second." On March 19, 2021, she was asked again to provide the date that she *first* suspected that A.E.N. was

---

[22] The report was also admitted into evidence as Court's Exhibit 1.

being sexually abused by Mr. Nowlan and she replied "February twenty-second." When asked the reason for her suspicions of sexual abuse on February 22, 2020, she responded that A.E.N. said "daddy does bad stuff to me." She reported that A.E.N. would have been four years of age at the time.

. . . .

Mrs. Nowlan was asked to outline the specific factors that led her to believe that A.E.N. was being sexually abused by Mr. Nowlan. She stated that on "February twenty-second" she began to suspect sexual abuse "because of him not taking her to the doctor, what is he hiding." She stated that A.E.N. had "vaginal irritation" that was "not getting better." She then stated, "*first it was more medical neglect, then as we were driving, she said daddy does bad stuff to me." "He makes me drink beer and I don't like it."* She was asked if there was anything else that made her suspect that A.E.N. was being sexually abused and she stated "she told my mom he would put stuffies in her butterfly." According to Mrs. Nowlan, A.E.N. stated that Mr. Nowlan would "stick stuff in her vagina part and play hide and seek and she would close her eyes because it hurt."

(*Id.* at 12–13 (emphases in original).) The report also notes the following regarding AEN's

medical care:

Mrs. Nowlan was then asked about any other service providers, medical professionals, law enforcement agents, or psychiatric professionals, that had examined or interviewed A.E.N. *prior* to her initial session with Laurie Thomas. She stated that she took A.E.N. to a hospital in Canada, "but they refused to see her." It was noted that at different times in the interview, Mrs. Nowlan appeared equivocal in her descriptions of the reasons that A.E.N. was taken to the hospital in Canada. At one point, it appeared as though she was suggesting she took A.E.N. to the hospital due to specific concerns of sexual abuse victimization. However, at other times, she seemed to minimize those concerns and stated it was more due to concerns of "medical neglect" while in Canada.

She later reported that she removed A.E.N. from Canada due to "medical neglect" concerns. She indicated that A.E.N. was subsequently interviewed by someone with the [FBI] soon after their return to the United States. After the interview, Mrs. Nowlan stated that the FBI personnel told her that "it was too

early to determine" whether or not A.E.N. had been sexually
abused. She indicated that she felt "numb" afterwards.

(*Id.* at 13–14 (emphasis in original).) The report also mentions that Nina "stated that she

informed FBI Agent Pittman of her concerns that A.E.N. had been sexually abused by her

father prior to A.E.N.'s *first* interview with the FBI that was conducted on March 11, 2020."

(*Id.* at 36 (emphasis in original).) Nina was apparently told "not to jump to that conclusion"

(*i.e.*, that AEN had been sexually abused) after AEN completed the first interview with Ms.

Hively. (*Id.*)

Drs. Fender and Loehrer asked Nina about AEN's March 18, 2020 appointment with

Dr. Karp at UVA. (*See* Pet'r Ex. 24.) As noted above, that medical record did not mention

anything about sexual abuse or vaginal irritation. In the report, Drs. Fender and Loehrer

reported:

> She indicated that the medical professionals at [UVA] "looked at
> her (A.E.N.'s) vagina rash which went away with Desitin use."
> She stated that she informed the doctors at UVA about her
> concerns of sexual abuse victimization. She went on to say that
> the doctor did not identify the presence of physical signs of
> sexual trauma. It should be noted that Mrs. Nowlan's statement
> that she disclosed concerns of sexual abuse to the treating
> physician at UVA on March 18, 2020 were not supported by
> additional documents reviewed by the undersigned evaluators.
> Specifically, the UVA medical records section entitled "chief
> complaint" did not document sexual abuse allegations, which was
> also cited in the report prepared by the *Guardian Ad Litem*.

(Court Ex. 1 at 14.)

In contrast, as discussed in Section II.L, Nina testified at trial that she took AEN to

Virginia because she thought AEN was being medically neglected by Bryce, not because she

suspected sexual abuse. Nina also believed that because AEN was not in the system at the

Canadian emergency room, AEN had never received medical care in Canada. Further, Nina testified that AEN did not make the first concerning statement in the bathtub until "the end of March." (Trial Tr. Day 2, at 184:1.) Nina also confirmed at trial that prior to the first forensic examination with the FBI on March 11, 2020, AEN had not made any statements indicating sexual abuse. (*See* Trial Tr. 184:11–25.) These contradictions—involving the timing of Nina's suspicions and the fact that the UVA medical records do not mention anything about sexual abuse or vaginal irritation, despite Nina saying she discussed it with Dr. Karp—are concerning.

Drs. Fender and Loehrer concluded that "[c]oncerns reasonably exist in the current clinical scenario with respect to sexual abuse allegations." (Court Ex. 1 at 36.) They analyzed the facts outlined in Section II.M and II.O, regarding AEN's vaginal irritation and/or infection, and AEN's statements to her grandmother, mother, and Ms. Thomas. Drs. Fender and Loehrer also discussed the factors "that reduce confidence in reaching a conclusion that A.E.N. has been sexually abused." (*Id.* at 37.) They noted:

> [S]ufficient *reliable* data to confirm that A.E.N. has conclusively been sexually abused were not identified by the undersigned evaluators. The limitations or barriers to reaching a conclusion of confirmed sexual abuse included the lack of an opinion from any legal authority, such as social services or law enforcement. Additionally, a forensic nurse examination did not produce physical evidence or provide any documented medical data that confirms, or refutes, that A.E.N. was sexually abused. A second medical appointment at [UVA] did not cite any references to confirmed sexual abuse victimization. Therefore, no conclusions can be drawn from the medical examinations.

(*Id.*)

Regarding Ms. Thomas's "diagnosis" that AEN had been sexually abused, Drs. Fender and Loehrer discussed the "concerns" they had about Ms. Thomas's confidence level,

including her seeming "lack [of] professional awareness" to potential biases, her position that any additional information from the father would be inconsequential to her diagnosis, her reliance on incomplete data, and her refusal to consider any additional data after the fact. (*See id.* at 37–39 ("[W]hen Laurie Thomas was presented with new data, it appeared as though she was completely closed to any consideration of the new information with respect to the ongoing assessment and treatment of A.E.N.").) Drs. Fender and Loehrer also discussed Dr. Christopher Lane's[23] analysis of Ms. Thomas's testimony and diagnosis. The report states that "Dr. Lane appropriately identified concerns in this case that included: bias, demand characteristics, the shortcomings of Laurie Thomas's projective methods in determining a diagnosis of child sexual abuse victimization by her father, the failure to attend to, consider, and incorporate the impact of a highly conflictual legal case of this nature on all individuals involved, which may consequently produce motivations to manipulate, conceal, minimize, or embellish information." (*Id.* at 39.)

Drs. Fender and Loehrer identified a number of concerns, including AEN's potential "exposure to domestic violence, continuous parental conflict, caretaker instability, parental substance use/abuse, parental alienation, emotional/psychological abuse, dysfunctional parenting, and family separation." (*Id.* at 39). They also correctly recognized that those concerns are outside the scope of this case. Ultimately, Drs. Fender and Loehrer "were unable to conclude that the child has been sexually abused." (*Id.* at 40.) They concluded their report with a warning that AEN "will likely continue to be at risk to experience future trauma, to

---

[23] Dr. Lane testified as Petitioner's rebuttal expert witness. His sole role in the proceeding was to examine and opine on the conclusions Laurie Thomas reached.

some degree, until a resolution is reached between the parents that serves A.E.N.'s best interests." (*Id.*)

### III.   EVIDENTIARY RULINGS

There remain two outstanding objections that the court must address before turning to the merits of the Hague petition.

#### A.   Article 30 Objection

At the final pretrial conference held on Friday, January 22, 2021, Respondent's counsel raised an objection regarding the admissibility of 17 of Petitioner's proposed exhibits[24] under Article 30 of the Hague Convention. The exhibits include documents from the Canadian Hague Proceeding and orders from the Canadian Custody Proceeding. Respondent argues that these documents are: (1) not relevant as they predate this proceeding, and (2) inadmissible under Article 30 of the Hague Convention because they were not provided by a "Central Authority." *See* Hague Convention, art. 30. For the reasons stated in the final pretrial conference, and the additional reasons stated here, the court finds otherwise and will overrule the objection.

Article 30 of the Hague Convention states:

> Any application submitted to the Central Authorities or directly to the judicial or administrative authorities of a Contracting State in accordance with the terms of this Convention, *together with documents and any other information appended thereto or provided by a Central Authority, shall be admissible* in the courts or administrative authorities of the Contracting States.

*Id.* (emphasis added); *see also Ngassa v. Mpafe*, 488 F. Supp. 2d 514, 518 n.3 (D. Md. 2007)

---

[24] Specifically, Respondent objected to proposed exhibits 3, 7, 9, 10, 13, 14, 16–18, 20, 21, 25–28, 30, and 35.

("Article 30 of the Convention also provides that any application submitted to the Court, together with documents and any other information appended thereto, shall be admissible."). Moreover, the International Child Abduction Remedies Act ("ICARA")—which is the implementing statute of the Hague Convention in the United States—further states:

> With respect to any application to the United States Central Authority, or any petition to a court under section 9003 of this title, which seeks relief under the Convention, *or any other documents or information included with such application or petition or provided after such submission which relates to the application or petition*, as the case may be, *no authentication of such application, petition, document, or information shall be required* in order for the application, petition, document, or information *to be admissible in court.*

22 U.S.C. § 9005 (emphasis added).[25] Finally, Federal Rule of Evidence 1101(e) allows for "[a] federal statute . . . [to] provide for admitting or excluding evidence independently of these rules." Fed. R. Evid. 1101(e).

First, insofar as Respondent argues that the various exhibits are not relevant, Petitioner counters that because Respondent is challenging the child's habitual residence at the time she was removed from Canada, these exhibits are relevant to demonstrate that she habitually resided in Canada. The court agrees. The exhibits pass the test for relevancy outlined in Federal Rule of Evidence 401; the documents at issue make a fact at issue (AEN's alleged habitual residence in Canada) more probable than it would be without that evidence. Determining AEN's habitual residence is a critical part of Petitioner's *prima facie* case, and the Canadian court documents are relevant to that determination.

---

[25] The court recognizes that Article 30 expressly provides for admissibility, while ICARA contemplates only authentication. The court views ICARA as specifically addressing a subset of Article 30 (*i.e.*, a document does not have to be authenticated in order to be admissible). These provisions seek to ease the burden of evidentiary issues.

Second, Respondent argues that in order for such documents to be admissible, they would need to be provided by the Central Authority (the Department of State). The clear language in Article 30 and ICARA belie this interpretation. Article 30 provides that any application (including the appended materials) that is submitted "to the Central Authorities *or directly to the judicial* or administrative *authorities* . . . shall be admissible." Hague Convention, art. 30. Further, ICARA bypasses the authentication requirement "[w]ith respect to any application to the United States Central Authority, *or any petition to a court*." 22 U.S.C. § 9005. While this is a departure from the typical process under the Federal Rules of Evidence, the Rule 1101(e) expressly allows for such differences if provided for by a federal statute. ICARA is a federal statute, and the Hague Convention, as a treaty, is the supreme law of the land. *See* U.S. Const. art. VI. Respondent's counsel expressed disagreement with the rule, but the Hague Convention and ICARA are clear. Respondent's objection will therefore be overruled.

### B.    Hearsay

Petitioner objected to the admission of several statements made by AEN to her mother and grandmother. These statements all relate to potential sexual abuse in some way and include, most notably, AEN's statements that she and her father "play hide and seek" by putting toys in her vagina, (Trial Tr. Day 2, at 65:25–66:9), that she "peed on Daddy's face," (Trial Tr. Day 2, at 66:21–67:1), and that her father rubbed her vagina with a loofa (Trial Tr. Day 2, at 185:12–24). The court need not rule on the admissibility of these statements because Petitioner prevails even if they are admitted. But even if their admission was material to the outcome of the case, the court would admit them under Federal Rule of Evidence 807 because they are accompanied by indicia of trustworthiness and, as some of the only direct statements

from AEN on the issue of sexual abuse, are more probative than other reasonably available evidence. *See e.g., United States v. DeLeon*, 678 F.3d 317, 329 (4th Cir. 2012), *vacated and remanded on other grounds sub nom. DeLeon v. United States*, 130 S. Ct. 2850 (2013); *United States v. Peneaux*, 432 F.3d 882, 891–92 (8th Cir. 2005).

## IV.   CONCLUSIONS OF LAW

The Hague Convention seeks to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, preamble. The Hague Convention applies to children under the age of 16 who habitually resided in a state that is a party to the Convention immediately prior to the child's wrongful removal or retention. *Id.* art. 4.

The United States and Canada are both signatories of the Hague Convention. *Wertz v. Wertz*, No. 7:18cv00061, 2018 WL 1575830, at *7 (W.D. Va. Mar. 30, 2018). The United States implemented the Hague Convention through ICARA. *See* 22 U.S.C. §§ 9001, *et seq.*

The court's inquiry under the Hague Convention is narrow. Under ICARA, courts in the United States may "determine only rights under the Convention and not the merits of any child custody claims." 22 U.S.C. § 9001(b)(4). Accordingly, Hague Convention courts have a limited role; they must determine "whether there has been a wrongful removal, the existence and exercise of custody rights at the time of the removal, and the applicability of any Hague Convention defenses." *Wertz*, 2018 WL 1575830, at *1.

The court's inquiry is *not* what is in the best interest of the child; rather, the court can only determine if the petitioner has made a *prima facie* case and whether any defenses apply. *See*

*Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 610–11 (E.D. Va. 2002), *aff'd sub nom. Escaf v. Rodriguez*, 52 F. App'x 207 (4th Cir. 2002). Whether the court orders the return of the child does not alter any preexisting allocation of custody rights between parents because the Hague Convention leaves ultimate custodial decisions to the courts of the country of habitual residence. *Wertz*, 2018 WL 1575830, at *7 (citing *Abbot v. Abbot*, 560 U.S. 1, 9 (2010)).

A.   *Prima Facie* **Case**

To establish a *prima facie* case under the Hague Convention, "the petitioner must establish that: (1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal; (2) the removal was in breach of the petitioner's custody rights under the law of his home state; and (3) that the petitioner had been exercising those rights at the time of removal." *Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009) (citing *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001)). Ultimately, the petitioner must prove that the child has been "wrongfully removed or retained within the meaning of the Convention" by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A).

1.   **Habitual Residence**

First, Petitioner must demonstrate that the child was habitually resident in Canada at the time of removal. In *Monasky v. Taglieri*, the Supreme Court clarified the standard for determining a child's habitual residence. 140 S. Ct. 719 (2020). The Court held that "a child's habitual residence depends on the totality of the circumstances specific to the case." *Id.* at 723. For older children, "facts indicating acclimatization will be highly relevant." *Id.* at 727. For younger children, "especially those too young or otherwise unable to acclimate," the Court held that "the intentions and circumstances of caregiving parents are relevant considerations."

*Id.* Nevertheless, Justice Ginsburg concluded: "There are no categorical requirements for establishing a child's habitual residence." *Id.* at 728.

The Court further ruled that "[a]n actual agreement between the parents is not necessary to establish an infant's habitual residence." *Id.* at 722. In rejecting the rule that parental agreement is necessary to establish a child's habitual residence, the Court held that such a requirement "would enable a parent, by withholding agreement, unilaterally to block any finding of habitual residence for an infant." *Id.* at 728. Adoption of an "actual-agreement requirement" would therefore "undermine the Convention's aim to stop unilateral decisions to remove children across international borders." *Id.*

Respondent argues that AEN was habitually resident in the United States on February 23, 2020, when she removed AEN from Canada. She contends that, because Petitioner's removal of AEN to Canada approximately three years prior was "wrongful," AEN's habitual residence never became Canada. As such, Respondent contends that *her* removal of AEN from Canada was not "wrongful" under the Hague Convention and ICARA. *See* Hague Convention, art. 3; 22 U.S.C. § 9003(e)(1)(A).

Respondent's arguments fall under four broad points: (1) the court should not conflate Justice Fraser's "now-settled" determination in the Canadian Hague Proceeding with AEN's habitual residence, as that determination is not entitled to comity; (2) the court should heavily weigh Petitioner's stipulation in the Canadian Hague Proceeding that he wrongfully retained AEN in Canada; (3) the court should afford comity to the Virginia Circuit Court's opinion; and (4) AEN's habitual residence is Virginia under *Monasky* and Fourth Circuit case law holding that a parent cannot create a new habitual residence for a child by wrongfully removing

and sequestering the child. The court addresses each in turn.

        i.      *Comity and Justice Fraser's "Now-Settled" Determination*

Both parties argue that this court should give comity to Justice Fraser's opinion in some respects. Petitioner argues that Justice Fraser's "now-settled" finding should inform this court's "habitual residence" finding. Respondent argues that this court should only afford comity to the extent Justice Fraser found that Petitioner wrongfully retained AEN in Canada as of July 2017. Respondent then argues that this court should not afford comity to Justice Fraser's "now-settled" finding because it was legally and factually incorrect (as to AEN's age). In other words, Respondent argues that the court should not conflate Justice Fraser's Article 12 "now-settled" finding with a finding that AEN was habitually resident in Canada.

It is clear that Respondent disagrees with Justice Fraser's "now-settled" finding, and that she is seeking to relitigate the Canadian Hague Convention proceeding. The court declines that invitation. The issues before the Canadian Hague Court are entirely different—legally and factually—than those before this court. The Canadian Hague Court considered the facts regarding AEN's habitual residence as of July 2017. But this court must examine the facts as of February 2020. Further, the "now-settled" defense is not an issue in this case. As such, this is not a matter of affording comity (or not). Nor will the court conflate Justice Fraser's "now-settled" finding with its own habitual residence finding. The court recognizes what occurred in the Canadian Hague Proceeding and, as discussed below, the effects of that proceeding on Petitioner. But as it must, this court will independently conduct on its own factual findings as to AEN's habitual residence.

ii.    <i><u>Petitioner's Stipulation in the Canadian Hague Proceeding</u></i>

In the Canadian Hague Proceeding, Petitioner (who was the respondent in that matter), did "not dispute that [AEN's] habitual residence was in the State of Virginia on July 1, 2017, and that her retention in Ontario was technically wrongful." (Resp't Ex. 5 ¶ 3.) Respondent emphasizes this stipulation in arguing that AEN's habitual residence never changed to Canada.

In the Canadian Hague Proceeding, the court was examining the child's habitual residence as of July 2017 (when Respondent argues that Petitioner wrongfully retained AEN in Canada). *See* Hague Convention, art. 3 (the court must look at the habitual residence "*at the time of removal or retention*" (emphasis added)). As of July 2017, there was no reasonable argument that AEN's habitual residence could have been anywhere except the United States. At that point in AEN's life, she had never been out of the United States. She had solely lived in Virginia and New York.

Again, the question before this court is entirely different. Under the Hague Convention, this court must determine if Respondent's removal of AEN from Canada on February 23, 2020, was wrongful. As such, the court must determine where AEN's habitual residence was as of February 2020, not July 2017. For this reason, the court gives little weight to Petitioner's stipulation in the Canadian Hague Proceeding.

iii.    <i><u>Virginia Circuit Court Opinion Retaining Jurisdiction Over Custody Proceeding</u></i>

The Circuit Court for Augusta County, Virginia granted Nina's motion to retain jurisdiction after the Virginia JRD Court found that Canada was a more convenient forum and dismissed the case. The Circuit Court found that Virginia was AEN's home state under the UCCJEA and that Virginia was not an inconvenient forum (as AEN was again living in

Virginia). Respondent argues that the court should defer to the Virginia Circuit Court's opinion. This argument is unpersuasive because Respondent is conflating the Virginia Circuit Court's holding under Virginia law with this court's determination under the Hague Convention (notably, the precise thing Respondent accuses Petitioner of doing regarding Justice Fraser's opinion).

Again, the legal determination before the Virginia Circuit Court was different than the legal issues currently before this court. Virginia courts must apply the UCCJEA to determine if they have jurisdiction over a child custody matter. *See supra* note 11. The purpose of the Hague Convention, on the other hand, is to ensure that, when appropriate, children are returned to the countries of their habitual residence so that the courts of that country can properly adjudicate custody. Indeed, Article 16 of the Hague Convention requires that courts in the country in which a child has been wrongfully removed or retained "shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention." Hague Convention, art. 16.

As outlined in Section II.Q, while the Virginia Circuit Court found that Virginia was AEN's "home state" and that AEN's time in Canada constituted a "period of temporary absence" under the UCCJEA, it did not have the benefit of a contested proceeding and only heard from Respondent. As a result, the Virginia Circuit Court based its opinion on "facts" that were one-sided, partially inaccurate at times, and vehemently contested in this proceeding. Because the Virginia Circuit Court did not have a complete and accurate factual picture—and because the UCCJEA "home state" determination does not have any bearing on this Hague Convention proceeding—the court gives no weight to the Virginia Circuit Court opinion.

iv.    *Totality of the Circumstances*

As noted above, the Supreme Court has held that the habitual residence determination "depends on the totality of the circumstances specific to the case," and described it as a "fact-driven inquiry." *Monasky*, 140 S. Ct. at 723, 727. The Court further held that an agreement between the parents is not necessary to establish a child's habitual residence, for fear that one parent could unilaterally block a habitual residence determination. *Id.* at 723, 728. The court will therefore examine the circumstances surrounding AEN's life in Canada, not legal determinations by other courts.

When Petitioner first brought AEN to Canada on April 1, 2017, AEN was 16 months old. AEN then lived in Canada for almost three years. On February 23, 2020, AEN was four years, three months old. As of February 23, 2020, AEN had spent the majority of her life in Canada. The evidence establishes that AEN had a home in Canada. She lived with her father in Petawawa, Ontario. She participated in recreational activities there with her father, such as hiking and camping. AEN had caretakers and attended day care while her father was working. At the appropriate age, AEN attended Junior Kindergarten in Canada. She had friends and spent time with Petitioner's extended family there. Petitioner also provided AEN with health care in Canada. AEN's early childhood memories are from Canada, and she lived a fully integrated life there.

In *Monasky*, the Supreme Court noted that, for younger children, "the intentions and circumstances of caregiving parents are relevant considerations." *Id.* at 727. The Court concluded that "[n]o single fact, however, is dispositive across all cases." *Id.* In this case,

Petitioner's intentions weigh in favor of finding that Canada is AEN's habitual residence. It is undisputed that the parents agreed for Petitioner to take AEN to Canada, although the specific facts of that agreement are disputed. In any event, Petitioner did not return AEN to Respondent because he believed that Respondent never complied with the Virginia CPS recommendations. He also blocked Respondent's calls on the advice of the military police because her communications, as detailed above, became hostile and threatening. The court finds that Petitioner did not have malicious intentions, despite Respondent's views otherwise. Regardless, as emphasized in *Monasky*, there is no "actual-agreement requirement." *Id.* at 728 ("An actual-agreement requirement would enable a parent, by withholding agreement, unilaterally to block any finding of habitual residence for an infant. If adopted, the requirement would undermine the Convention's aim to stop unilateral decisions to remove children across international borders.").

Respondent argues that Petitioner engaged in continuing child abduction from July 2017, and he should not now benefit from his abduction. Respondent relies on *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001), which states that "a parent cannot create a new habitual residence by wrongfully removing and sequestering the child." *See also Smedley v. Smedley*, 772 F.3d 184, 186 (4th Cir. 2014). But Respondent's use of these cases—and a well-accepted concept under Hague Convention jurisprudence—is misplaced because Petitioner had no reason to think that his "abduction" was "continuing" after the Canadian Hague Proceeding ended in his favor. As discussed above, the Canadian Hague Court found that AEN was "now-settled" in Canada in 2019. Petitioner possessed a court opinion and order explicitly holding that AEN *was to remain in Canada*. Under Respondent's logic—because she disagrees with

Justice Fraser's decision—Petitioner should have assumed that Justice Fraser's opinion was incorrect and ignored it. But such a response would have been nonsensical and would have required Petitioner to ignore a binding court order.

Under the totality of the circumstances, the court finds that on February 23, 2020, AEN's habitual residence was in Canada.

### 2. Breach of Petitioner's Custody Rights

Second, the petitioner must demonstrate that the child's removal was in violation of his or her custody rights in the country of habitual residence. Under the Hague Convention, the removal or retention of a child is wrongful when "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention." Hague Convention, art. 3(a). As such, the analysis must be based on: (1) the petitioner's custody rights at the time of the alleged wrongful removal, and (2) the child's habitual residence (as examined in the first element of the *prima facie* case). *See id.*; *White v. White*, 718 F.3d 300, 307 (4th Cir. 2013). An important implication of this analysis is that the court may have to apply family/custody law of another country to determine whether the removal was in breach of the petitioner's custody rights. *See Wertz*, 2018 WL 1575830, at *10 ("The parties agree that Canadian law governs Petitioner's custody rights and whether Respondent breached those rights by removing L.E.W.").

The Hague Convention eases this process. Article 14 states:

> In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally [recognized] or not in the State of the habitual residence of the child, without recourse to the specific procedures for the

> proof of that law or for the recognition of foreign decisions
> which would otherwise be applicable.

Hague Convention, art. 14; *see also* Fed. R. Civ. P. 44.1 ("A party who intends to raise an issue

about a foreign country's law must give notice by a pleading or other writing. In determining

foreign law, the court may consider any relevant material source, including testimony, whether

or not submitted by a party or admissible under the Federal Rules of Evidence.").

The central inquiry for this element is what constitutes a "right of custody." Under the

Hague Convention, "rights of custody . . . may arise in particular by operation of law or by

reason of a judicial or administrative decision, or by reason of an agreement having legal effect

under the law of that State." Hague Convention, art. 3. The Hague Convention defines "rights

of custody" to "include rights relating to the care of the person of the child and, in particular,

the right to determine the child's place of residence." *Id.*, art. 5(a).

Under Canadian Law,[26] a *ne exeat* (Latin for "that he not depart") right, or the authority

to consent before the other parent may take a child to another country, is a "right of custody"

under the Hague Convention. In a Canadian Supreme Court case, *Thomson v. Thomson*, [1994]

3 SCR 551, the custody court (a Scottish court) issued a temporary custody order containing

a non-removal clause. The mother in that case removed the child from Scotland and traveled

to Canada in violation of that non-removal clause. The Canadian Supreme Court held the non-

removal clause constituted a custody right for purposes of the Hague Convention, and that

the mother breached the father's custody right by removing the child from Scotland.

---

[26] This information has been taken from an affidavit submitted by Petitioner on Canadian law. (Pet'r Ex. 2.)
The affidavit was submitted by Shane Foulds, who is the lead counsel for the Central Authority for the Province
of Ontario with respect to any Hague Convention cases. The court may consider affidavits of foreign law to
establish rights of custody. *Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000).

The same is true here. Respondent has conceded that Justice Fraser's February 6, 2020 order—stating that "[AEN] shall not be removed from Canada by the mother without a further order of this court or by written agreement between the parties" (Pet'r Ex. 9)—created a right of custody under Canadian law. (*See* Trial Tr. Day 1 234:1–4 ("Did [Respondent] violate a February 6 order by Justice Fraser say[ing that the] child should not leave Canada without father's consent? Yes, okay. They've established that. We've admitted that.").) It is also undisputed that Respondent removed AEN from Canada on February 23, 2020, in violation of Justice Fraser's custody order. The court therefore finds that Respondent's removal of the child was in violation of Petitioner's custody rights.

### 3.      Exercising Custody Rights

Finally, a petitioner must show that that he or she was exercising custody rights at the time of the child's removal. *Wertz*, 2018 WL 1575830, at *11. The key word here— "exercising"—is "liberally construed" in this context, and is found "whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Id.* (quoting *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007)). In other words, when a parent has custody rights under the law of the child's state of habitual residence, that parent cannot "fail" to exercise his or her custody rights short of abandoning the child. *Id.* (citations omitted).

The court need not belabor this point, as it was not challenged by Respondent. Petitioner had far more than just "regular contact" with AEN; he was AEN's primary caregiver for almost three years, between April 1, 2017, and February 22, 2020. Petitioner did not abandon AEN. He was therefore exercising his custody rights when Respondent took AEN across the Canadian border to the United States on February 23, 2020. The court therefore

concludes that Petitioner easily satisfies the third element of the *prima facie* case under the Hague Convention.[27]

## B.    Grave Risk Exception

If a petitioner can demonstrate a *prima facie* case, the court must order the child's return to the country of habitual residence unless the respondent can establish one of the exceptions under the Hague Convention. *See* Hague Convention, arts. 12–13, 20. In this case, Respondent asserts that returning AEN to Canada would subject her to a grave risk of harm because, Respondent alleges, Petitioner sexually abused AEN. As such, only the exception under Article 13(b) is at issue here.

To establish the grave-risk exception, the respondent must show that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Courts narrowly interpret the grave-risk exception. *Wertz*, 2018 WL 1575830, at *13; *see Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) ("The 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule."). The respondent must prove the exception by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). "To be clear and convincing, evidence must place in the ultimate factfinder an abiding conviction that the truth of [the party's] factual contentions are highly probable." *United States v. Ali*, 874 F.3d 825, 831 n.2 (4th Cir. 2017) (internal quotation marks omitted) (alteration in original) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

---

[27] For these reasons, the court denies Respondent's oral motion (and renewed motion) for judgment as a matter of law under Federal Rules of Civil Procedure 52(c) (and alternatively, Rule 56).

Credible evidence that the petitioning parent subjected or would subject the child to sexual abuse would constitute a "grave risk" or an "intolerable situation" under the Hague Convention. *See, e.g.*, *Simcox*, 511 F.3d 607–08 ("[T]here are cases in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect."); *Ischiu v. Garcia*, 274 F. Supp. 3d 339, 350 (D. Md. 2017) ("Certainly, sexual abuse of the child would constitute a grave risk of placing the child in an intolerable situation.").

Often, whether abuse has occurred will depend on the credibility of the witnesses. *See Ischiu*, 274 F. Supp. 3d at 351 ("The assessment of the evidence relating to grave risk depends significantly on the credibility of the witnesses."). Even Respondent, in her pretrial brief, noted that her defense will "hinge largely on the credibility of AEN and persons to whom she has described her father's sex abuse." (ECF No. 51 at 18.)

The court finds that Respondent has not met her burden of demonstrating that the grave-risk exception applies for three primary reasons.

First, Drs. Fender and Loehrer were "unable to conclude that the child has been sexually abused." (Court Ex. 1 at 40.) The court appointed Drs. Fender and Loehrer as neutral expert witnesses under Federal Rule of Evidence 706. They had no stake in the outcome of this case, and the court paid for their services. Drs. Fender and Loehrer conducted a thorough investigation. They interviewed the parties, read the voluminous record before the court, and produced a 40-page report outlining the interviews, their findings, and their conclusions. For these reasons, the court affords their expert opinions great weight.[28]

---

[28] The court does not, however, place the court's own role on Drs. Fender and Loehrer. The court recognizes

Drs. Fender and Loehrer wrote that AEN's statements, in addition to her vaginal symptoms in February 2020, created cause for concern. As such, Drs. Fender and Loehrer examined law enforcement's involvement, AEN's medical records, AEN's interviews with the FBI forensic examiner (Jodie Hively), and the records from AEN's mental health providers, Ms. Thomas and Ms. Martinez. They also reviewed Ms. Thomas's *de bene esse* deposition. After their review, Drs. Fender and Loehrer noted: "Based on all of the professionals that have been involved in this case who have interviewed or examined A.E.N., we are left with one professional's opinion that A.E.N. was sexually abused by her father. No other professional has rendered a similar opinion. There is no social services agency disposition of founded or unfounded sexual abuse and no criminal charges have been filed." (Court Ex. 1 at 38.) For the reasons discussed at length above and in the report, Drs. Fender and Loehrer ultimately shared the court's apprehensions about Ms. Thomas's testimony; they found it concerning for numerous reasons, and they devoted a substantial portion of their report to that analysis. Drs. Fender and Loehrer ultimately did not identify any "*reliable* data to confirm that A.E.N. has conclusively been sexually abused." (*Id.* at 37 (emphasis in original).)

Second, many of AEN's statements suggest she was merely reiterating what Respondent has said to her (or, perhaps, what AEN has overheard Respondent saying to others).[29] (*See* Trial Tr. Day 2, at 179:24–180:5 (Nina testifying that AEN said something to the effect of "daddy does bad stuff"; Resp't Ex. 11 (multiple instances in play therapy where AEN describes

---

that it alone is tasked with deciding whether the grave-risk exception applies. It nevertheless considers their expert opinion in its role as factfinder.

[29] At the time AEN made these statements—the spring of 2020—she was four years old.

Bryce as "bad," or stated that he was a "bad man"); ECF No. 58 at 34 (GAL Report: "I asked

[AEN] to tell me a time when she had told the truth. She told me, "I told the truth about my

Daddy." I asked, "What truth did you tell about your Daddy?" She responded, "That he is a

bad man.").)

There are other instances in the record indicating that AEN picked up this terminology

from Nina. For example, when Blake Kilgore testified, he spoke about times where he was

privy to Skype calls between Nina and AEN. He testified that the calls would start by Nina

"engaging the child [in a way] that was very typical." (Trial Tr. Day 1, at 200:18–20.) He then

testified that "it would immediately transition into telling the child that, you know, your father

is a bad man, he's keeping you from me. A lot of trying to, essentially, degrade Bryce to the

child." (Trial Tr. Day 1, at 200:20–23.) The court finds that these statements are highly

indicative of either coaching by Respondent, or at least AEN picking up language that she has

heard Respondent using to describe Petitioner. The court therefore gives little weight to these

statements.

The court further finds that many of AEN's concerning statements regarding Petitioner

touching her vaginal area, while alarming in a vacuum (and incredibly concerning to the court

at the outset of this case), are much less so given the detailed and credible testimony about

AEN's yeast infections in 2018 and 2020. The court cannot ignore Petitioner's testimony that

in 2018 and in 2020 (right before AEN was taken from Canada), he purchased an ointment to

apply to AEN's vaginal area. Ms. Penman, Petitioner's friend, corroborated this testimony as

to the presumed yeast infection in 2018, and there is evidence that Petitioner purchased

Canesten cream in February 2020. He also testified that he applied cream to AEN's vaginal

64

area approximately two dozen times with toilet paper. With this in mind, Petitioner used his hands (with toilet paper) and applied some amount of pressure to AEN's vaginal area approximately *24 times*. If AEN was uncomfortable while urinating, it is reasonably probable that the application of an antifungal cream would also be uncomfortable. Statements to the effect that her father touched her vaginal area ("butterfly"), or that he tickled her vaginal area, are explainable under these circumstances.

The court also notes that Petitioner vehemently denied ever touching his daughter's vaginal area under any other circumstances or engaging in any other sexually inappropriate behavior with her. He was forthright and consistent throughout his testimony on direct and cross examination, and, unlike Respondent, during his interview with the court-appointed experts. The court, in sum, believes Petitioner when he says that he did not sexually abuse AEN.

Third, the court did not find Respondent and Ms. Brown to be credible witnesses. Ms. Brown was understandably highly emotional throughout her testimony, but also had significant difficulty with remembering what the court considers to be important events. The court also notes that Ms. Brown may feel responsible for this entire situation, because her call to the police in 2017 ultimately resulted in the involvement of Virginia CPS and AEN's relocation to Canada. It was clear from her testimony that she regretted the decision in hindsight.

Further, unlike Petitioner's testimony, Respondent's account was discredited or called into serious question. Her trial testimony was inconsistent with what she later told Drs. Fender and Loehrer on critical facts underlying the grave-risk defense.

First, her testimony was inconsistent regarding when she first suspected sexual abuse, and she conflated her own timeline. Specifically, she consistently told Drs. Fender and Loehrer that she first suspected *sexual abuse* (and not solely medical neglect) on February 22, 2020 (while she was still in Canada). Respondent also told Drs. Fender and Loehrer that "she informed FBI Agent Pittman of her concerns that A.E.N. had been sexually abused by her father prior to A.E.N.'s *first* interview with the FBI that was conducted on March 11, 2020." (Court Ex. 1 at 36 (emphasis in original).) At trial, when asked "Why did you want the FBI to talk to [AEN] on March 11, 2020," she responded, "I figured [AEN] was being neglected, and also with her statements *towards the end of March* were very concerning." (Trial Tr. Day 2, at 183:23–184:1 (emphasis added).) Respondent's answer referred an event—AEN's statement in *late* March— *that had not yet happened*. The court asked Respondent the following questions:

> **The Court:** [L]et me ask you this: I think you testified, as I understood it, what motivated you to contact Special Agent Pittman at that time [before the March 11, 2020 interview] is you were concerned about your child's well-being based on what you observed in Canada and what you've just . . . described for us; is that correct?
>
> **Respondent:** Yes.
>
> **The Court:** At that time – I think you said a little later that what we're about [to] talk about, the statements related to potential sexual abuse, hadn't happened yet; is that correct?
>
> **Respondent:** Yes.
>
> **The Court:** Those came after you spoke to Pittman on March 11, correct?
>
> **Respondent:** Yes.

(Trial Tr. Day 2, at 184:11–25.) Drs. Fender and Loehrer even noted that Respondent

"appeared equivocal in her descriptions of the reasons that A.E.N. was taken to the hospital in Canada." (Court Ex. 1 at 13.) "At one point, it appeared as though she was suggesting she took A.E.N. to the hospital due to specific concerns of sexual abuse victimization. However, at other times, she seemed to minimize those concerns and stated it was more due to concerns of 'medical neglect' while in Canada." (*Id.*) Then, Respondent "later reported that she removed A.E.N. from Canada due to 'medical neglect' concerns." (*Id.*)

Second, Respondent's interview answers were inconsistent with the UVA medical records. According to the expert report, Respondent "indicated that the medical professionals at [UVA] 'looked at her (A.E.N.'s) vagina rash which went away with Desitin use.'" (*Id.* at 14.) "She stated *that she informed the doctors at UVA about her concerns of sexual abuse victimization.*" (*Id.* (emphasis added).) Then, Respondent "went on to say that the doctor did not identify the presence of physical signs of sexual trauma." (*Id.*) The court has reviewed the UVA medical records. (Pet'r Ex. 24.) There is no mention of sexual abuse or a vaginal rash. Drs. Fender and Loehrer also stated: "It should be noted that Mrs. Nowlan's statement that she disclosed concerns of sexual abuse to the treating physician at UVA on March 18, 2020 were not supported by additional documents reviewed by the undersigned evaluators." (Court Ex. 1 at 14.) These inconsistencies are highly concerning and lead the court to conclude that Respondent has not been entirely truthful in recounting key facts related to the alleged sexual abuse.

At bottom, the court recognizes that these are incredibly serious allegations, and that many of AEN's statements—in conjunction with her vaginal infection or irritation—are cause for alarm. Nevertheless, the court must apply the law. Here, ICARA mandates that "a

respondent who opposes the return of the child has the burden of establishing . . . by clear and convincing evidence" that the Article 13(b) exception applies. 22 U.S.C. § 9003(e)(2)(A). This court is not left with "an abiding conviction that the truth of [Respondent's] factual contentions are *highly* probable." *See Ali*, 874 F.3d at 831 n.2 (emphasis added). Because Respondent has failed to prove sexual abuse by clear and convincing evidence, the court must conclude, despite the grave nature of the allegation itself, that she has not established a grave risk of harm.

## V.   CONCLUSION

For the above reasons, Petitioner's Petition for Return of the Child (ECF No. 1) will be granted. A separate order will issue.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 10th day of June, 2021.


 */s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

1   the maternal grandmother.

2              THE COURT:  So we'll be prepared to do that before we

3   depart today.  Thank you.  We'll be in recess.

4              THE MARSHAL:  Please remain seated.  Court will be in

5   recess until 2 o'clock.

6              (A luncheon recess was taken 1:06 p.m. to 2:16 p.m.)

7              THE COURT:  Counsel, I apologize.  I told you 2

8   o'clock.  The Court, after reviewing the videos with counsel,

9   determined that it could go ahead and rule on that issue at

10  this point, and I think it would be beneficial for everyone if

11  I did that.  So I was taking the time to craft this ruling on

12  this issue, which I will now read into the record:

13             Petitioner has filed a motion in limine to exclude

14  from evidence two video interviews of AEN conducted by an FBI

15  forensic examiner.  The first forensic interview was conducted

16  in or about March of 2020, and the second was conducted a

17  couple of weeks ago, after the Petitioner Gerald Bryce Nowlan

18  filed his petition for return of the child, why we're here in

19  this proceeding.

20             Petitioner's counsel, Mr. Beers, obtained the videos

21  of these two forensic interviews after issuing a subpoena and a

22  so-called *Tuohy* request to the U.S. Attorney's Office.  A

23  "*Touhy* request" refers to a formal process of requesting

24  information from federal-government agencies, including the

25  United States Department of Justice, which is required under

1   the Code of Federal Regulations and stems from the U.S. Supreme

2   Court's decision in *United States ex rel Touhy v. Ragen*, 340

3   U.S. 462 (1951).  In short, a person or entity seeking

4   information contained in the files of a federal agency related

5   to the performance of the agency's official duties -- or

6   testimony about the same -- must obtain prior approval from an

7   appropriate official at that agency before the information or

8   testimony that is sought may be released.  Because the FBI is

9   an arm of the United States Department of Justice, the DOJ

10  *Touhy* regulations provide that formal requests for information

11  from FBI field divisions made to the U.S. Attorney's Office in

12  the same geographic region.

13       Counsel also subpoenaed the forensic examiner who

14  conducted AEN's interview to appear at this bench trial,

15  ostensibly to be a foundational witness for the videos.

16  According to Respondent's counsel, who engaged in follow-up

17  discussions with officials at the U.S. Attorney's Office, those

18  officials agreed to produce the videos of the interviews, but

19  but they declined to make the forensic examiner available as a

20  witness.

21       Respondent argues that, even without the testimony of

22  the forensic examiner, the Court should admit the videos.

23  Respondent contends that the child's statements to the forensic

24  examiner during that interview are relevant and necessary to

25  establish that the father sexually abused the child, and,

1    elatedly, that her return to his custody as a result would put

2    her at grave risk of physical harm.  Given the child's young

3    age (five) and attendant concerns about her competency to be a

4    witness at the upcoming trial, Respondent, through counsel, has

5    represented at various stages that she would seek to introduce

6    the statements of AEN during the forensic interview --

7    purportedly describing alleged sexual abuse -- in lieu of

8    having to call her as a witness, although Respondent has made

9    it clear that he's reserving -- she's reserving the right to do

10   so and will make a decision about that at some later point.

11        In so doing, Respondent acknowledges the obvious,

12   that the child's out-of-court statement to a third party who

13   was not her therapist or medical provider undoubtedly

14   constitutes hearsay under Federal Rule of Evidence 801 and 802,

15   and that it does not, or those statements do not, fall into any

16   of the authorized hearsay exceptions outlined in Rules 803 and

17   804.  Respondent, however, contends that the statement is,

18   nevertheless, admissible under the residual exception to the

19   hearsay rule, as set forth in Rule 807.

20        Petitioner objects to the introduction of the videos

21   of the child's statements to the FBI, arguing, among other

22   things, that without foundational testimony from the forensic

23   the examiner, the underlying hearsay statements of the child do

24   not meet the requirements of 807, including that the proffered

25   hearsay testimony at issue be supported by sufficient

1    guarantees of trustworthiness and reliability.  Second,

2    Petitioner contends that the video statements of the child are

3    not more probative on the point for which they are offered than

4    other evidence already admitted into the record in this

5    proceeding.  Petitioner also argues that the admission of these

6    videos without foundational testimony from the forensic

7    examiner and without satisfying the basic elements of Federal

8    Rule 807 would severely and unduly prejudice him.

9          Under Federal Rule of Evidence 807, the Court may

10   admit a hearsay statement, even if the statement is not

11   admissible under the hearsay exceptions contained in Rules 803

12   and 804 if three requirements are met:

13         First, the statement must be supported by sufficient

14   guarantees of trustworthiness after considering the totality of

15   the circumstances under which it was made and evidence, if any,

16   corroborating the statement.  That's Federal Rule of Evidence

17   807(a)(1).

18         Second, the statement itself must be more probative

19   on the point for which it is offered than any other evidence

20   that the proponent can obtain from reasonable efforts.  That's

21   Federal Rule of Evidence 807(a)(2).

22         Third, the party seeking to introduce the statement

23   must give the adverse party advance notice in writing of her

24   intent to use the statement, including the identity of the

25   declarant and the substance of the hearsay.  That's Federal

1    Rule of Evidence 807(b).  I find that that third requirement

2    has been satisfied clearly.  Counsel has provided ample notice

3    of his intent to try to introduce the videos.  Although rarely

4    utilized, numerous courts, including the Fourth Circuit, have

5    recognized the validity of 807 and applied it in various

6    contexts.

7            The courts have also cautioned against misusing

8    exception to circumvent the well-established principle that

9    hearsay not otherwise admissible under the specific exceptions

10   outlined in Rules 803 and 804 should not be permitted.  Put

11   simply, 807 should not be the exception that swallows the

12   rule.

13           In this bench trial, the Court must act as both the

14   gatekeeper and the finder of fact.  Accordingly, before the

15   Court can consider any evidence for purposes of analyzing the

16   Hague petition at issue and the affirmative defense that has

17   been raised in this case, specifically, grave risk of harm to

18   the child, it has to determine whether the proffered evidence

19   meets the requirements for admissibility under Federal Rules of

20   Evidence 104(a), 401, 402, 403, hearsay rules, and rules

21   governing the authenticity of evidence, the rules set forth

22   starting at Rule 901.

23           To exercise this threshold gatekeeping function with

24   respect to these FBI videos, the Court a couple of hours ago

25   reviewed them in their entirety with counsel on the record.

1    Based on the Court's careful consideration of what is portrayed

2    in these videos -- at least what is apparent from the videos

3    themselves -- the Court simply cannot conclude that the videos

4    meet the requirements for admission under 807.

5         Specifically, without foundational testimony from the

6    forensic examiner about, among other things, the circumstances

7    that gave rise to the interviews, her background,

8    qualifications, and experience as a forensic examiner, the

9    methodology she utilized during the interview, the identity and

10   roles of others present, including the mother, Nina Nowlan, who

11   is the Respondent in this case -- who I would also note is

12   depicted at various times in the interview room during both

13   interviews -- and any statements or comments made by the child,

14   the mother, other family members or third parties prior to or

15   during those meetings or thereafter are not contained on the

16   video, the Court simply cannot conclude that the proffered

17   hearsay is supported by sufficient guarantees of

18   trustworthiness justifying its mission under Rule 807.

19        The Court also notes that in the second video there

20   was a seven-minute gap where the screen is blank likely due to

21   some technical issue.  But without foundational testimony from

22   the examiner herself, there's no way to determine that with

23   reasonable certainty.  And during the second video, the child

24   goes out into the hallway for a couple of minutes, and she can

25   be heard conversing with other people, and not the interviewer

1    herself, off camera.  Also, during the second interview, the

2    forensic examiner appears to show the child the drawings and

3    diagrams that she had created with the assistance of her

4    treating therapist, Ms. Thomas, approximately six months before

5    the forensic interview in January of 2021.  While the child

6    explains what is depicted in those drawings, the examiner can

7    be seen taking notes, and the child apparently annotated the

8    drawings that day in January.  Neither the forensic examiner's

9    notes, nor the child's annotations, were produced by the FBI

10   with the video and are not part of the record.  So neither the

11   Court, nor the parties, can determine whether they would effect

12   the determination of trustworthiness or reliability of the

13   statements the child makes on the video.

14        The Court also notes that, during the second

15   interview, the examiner herself presented the drawings from the

16   play therapy with Ms. Thomas from approximately six months

17   before that and asked pointed questions about what the child

18   had previously told the therapist.  Although this direct and

19   confrontational technique, even though done in a soft and

20   professional way, may certainly be well-accepted and standard

21   practice for child forensic exams, the Court, without

22   additional information and background, cannot conclude that

23   they were appropriate or justifiable under these circumstances.

24   At a minimum, the Court would need an explanation as to why

25   such a direct approach was taken here.

1         Finally, the Court is concerned about various

2    statements the child made to the examiner during the interview

3    wherein she states that her "daddy committed a crime," and that

4    "he's bad."  When asked by the FBI examiner who told her this,

5    the child responded, "Mommy."  This is concerning and the Court

6    believes it raises genuine issues with respect to the mother's

7    influence on the child and possible -- let me emphasize that --

8    possible coaching prior to the interview.  Without testimony

9    from the forensic examiner about how she controls for potential

10   influences like this, the Court simply cannot conclude that the

11   other statements about alleged sexual abuse do not suffer from

12   the same potential influence of the mother.

13        In sum, context is critical to the Court's 807

14   analysis, and the video, standing alone, does not provide it or

15   bear the requisite indicia of veracity and reliability of

16   justifying its admission under the exception.  And absent these

17   indicia, the admission of the video under 807 would be unduly

18   prejudicial to the Petitioner.

19        Respondent also has not demonstrated that the hearsay

20   statements during the FBI interview are more probative on the

21   critical issue of alleged sexual abuse than other evidence

22   already in the record.  And that would be Rule 807(a)2.  The

23   Court has already ruled that the child's statements to the

24   treating therapist about the alleged sexual abuse by the

25   father, as well as the attendant drawings depicting that abuse,

1   are admissible under Federal Rule of Evidence 803(4).  The

2   Court, therefore, concludes that the child's hearsay statements

3   during the forensic interview are not more probative than her

4   admissible statements to the therapist.  Although the

5   statements to the FBI examiner are on video, while the therapy

6   statements are not, the Court does not find them any less

7   probative based on the fact that one is on video and one is

8   not.  Because Respondent has presented -- and the Court has

9   already admitted -- powerful and probative evidence from the

10  child on alleged sexual abuse by the father, it concludes that

11  the FBI videos do not satisfy the second prong of 807.

12          For all of these reasons, the Court will grant the

13  Petitioner's motion in limine to exclude the FBI videos, and

14  the Court will not consider them in deciding the merits of the

15  Hague petition and the affirmative defense of grave risk of

16  harm to the child.

17          So that's my ruling on the videos.

18          I'm going to in a little while have another ruling on

19  the 702, the *Daubert* motion, and I'm also going to propose and

20  direct the parties to take an additional step before we finish

21  this evidentiary proceeding, which isn't going to be today.

22          But I'd like to continue with the testimony and the

23  presentation of evidence at this time, and I'm happy to turn it

24  over to counsel.  I'm not sure who was going first.

25          MS. POWERS:  Thank you, Your Honor.  Counsel had

1    their only expert agrees, that credible evidence of sex abuse

2    is a grave risk, per se.  No second chances under the Hague.

3    That's it.  If he wants to talk about more about that, he goes

4    in front of Judge Goodwin.  That's the issue for this Court.

5          So to exclude that testimony from this therapist,

6    from this expert, would be inconsistent with 13(b).  Thank you,

7    Judge.

8          THE COURT:  Thank you.

9          MR. CULLEN:  Your Honor.

10         THE COURT:  Go ahead.

11         MR. CULLEN:  If I could just say one more thing.  The

12   enabling statute sets a burden of proof.  It's not

13   preponderance of the evidence standard.  He has to prove it by

14   the Fourth Circuit clear and convincing evidence.

15         THE COURT:  And I -- I understand what the burden of

16   proof is for the defense that's been asserted.  It's clear and

17   convincing evidence.  The Court I think has read every

18   published circuit court opinion dealing with this affirmative

19   defense.  I know we have seen all of the alleged sexual abuse

20   cases, so we're all on the same page.  I know ultimately what

21   the burden is and how the Court is to assess that.

22         All right.  I'm prepared to rule on this issue, and

23   I'm going to do so at this time.

24         Petitioner has filed a motion in limine under Federal

25   Rule of Evidence 702 -- that's ECF number 63 -- seeking to

1    exclude AEN's treating therapist, Laurie Thomas, from providing

2    expert testimony and opinions based on her interactions with

3    the child during therapy.  In sum, Petitioner argues that

4    although Ms. Thomas, a licensed clinical social worker, may

5    have the background, credentials, and clinical experience to

6    qualify as an expert witness in the field of clinical social

7    work, as a general matter, her opinions in this case do not

8    meet the standards for a liability under Federal Rule of

9    Evidence 702.

10        Respondent argues (1) that because this is a bench

11   trial, Rule 702 and the *Daubert* standard does not apply; and

12   (2) that even if they do, Ms. Thomas's opinions meet the

13   requisite standards of reliability under Rule 702 and should be

14   considered by the Court.

15        Respondent presented Ms. Thomas's testimony via de

16   bene esse deposition at the evidentiary hearing on Thursday,

17   January 29, 2021.  The Court reviewed the entire deposition

18   along with counsel for both parties, taking the motion in

19   limine with regard to Ms. Thomas's proffered expert opinions

20   during the deposition under advisement until the Court had

21   heard the testimony of Christopher Lane, a Ph.D. clinical

22   psychologist and Respondent's rebuttal expert.  Having now

23   heard that testimony, the Court is prepared to rule on the

24   motion in limine.

25        The Court will grant Petitioner's motion in limine

1    with respect to Ms. Thomas's expert opinions and not consider

2    those opinions as set forth in her expert report and reiterated

3    during her de bene esse deposition for purposes of evaluating

4    the grave risk of harm defense based on alleged sexual abuse by

5    petitioner, Mr. Nowlan.

6          As an initial matter, I find that *Daubert* applies in

7    this evidentiary hearing/bench trial such that the Court must

8    find that an expert witness's opinions meet the requirements of

9    relevance and reliability under Rule 702 before taking that

10   opinion testimony into account.

11         Rule 702 provides that, "a witness who is qualified

12   as an expert by knowledge, skill, experience, training, or

13   education, may testify in the form of an opinion or otherwise

14   if:  (A) the expert's scientific, technical, or other

15   specialized knowledge will help the trier of fact to understand

16   the evidence or to determine a fact in issue; (B), the

17   testimony is based on sufficient facts or data; (C), the

18   testimony is the product of reliable principles and methods;

19   and (D), the expert has reliably applied the principles and

20   methods to the facts of case.

21         In *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, the

22   Supreme Court explained that Federal Rule of Evidence 702

23   places the Court in a gatekeeping role between the expert

24   evidence and the trier of fact.  Respondent correctly notes

25   that the concerns underlying the Court's decision in *Daubert*

1    and its progeny -- specifically, the risk that unsound or

2    unreliable expert testimony will confuse or mislead a jury --

3    are less of a concern in a bench trial where there is no jury,

4    and the Court acts as both the gatekeeper and the finder of

5    fact.  But this does not mean that the Court should disregard

6    Federal Rule of Evidence 702 and the well-established standards

7    for assessing the relevance or reliability of purported

8    scientific evidence when it acts as the ultimate fact finder.

9    To do so would be to ignore the plain language of Rule 702

10   which applies to, quote, to any trier of fact, end quote.  That

11   is a jury or in cases such as this a judge.

12           Under Rule 702(a), I find Ms. Thomas's opinions to be

13   unhelpful in determining the facts at issue.  During

14   cross-examination, Ms. Thomas could not credibly answer

15   questions about the DSM-5 manual and other basic concepts

16   critical to properly diagnosing a person with psychiatric

17   disorders, even though she made such diagnoses for AEN.

18   Ms. Thomas testified that sexual abuse is a diagnosable

19   condition under the DSM-5 when it is not.  She was also not

20   familiar with the concept of demand characteristics -- in this

21   context, subtle cues by therapist that might suggest to a child

22   how she should respond to the therapist's questions -- and how

23   that might have affected AEN's statements to her.  As

24   demonstrated during cross-examination, Ms. Thomas also

25   seemingly failed to consider and apply differential diagnosis

1  in reaching conclusions about specific psychological disorders

2  affecting AEN.

3          Under Rule 702(b), I find that Ms. Thomas's opinion

4  testimony was also not based on sufficient facts or data.  For

5  example, Ms. Thomas had poor record keeping with respect to her

6  numerous conversations, telephone conversations, with AEN's

7  mother.  She had no record of approximately 20 calls with

8  Ms. Nowlan leaving the Court unable to analyze the potentially

9  substantial amount of information provided by Ms. Nowlan that

10 may have informed Ms. Thomas's opinions.  Further, the

11 information she received that informed her purported diagnoses

12 was one-sided and potentially biased.  Ms. Thomas failed or

13 refused to interview AEN's father or acknowledge that the key

14 facts in forming her opinions -- that is that AEN's father

15 sexually abused her -- are vehemently contested in this case.

16 During her deposition, Ms. Thomas scoffed at the reasonable

17 suggestion that the reality of what had occurred could be

18 different from what the child's mother had portrayed to her.

19         Under Rule 702(c) and 702(d), I find that Ms.

20 Thomas's testimony was woefully short on reliability.

21 Ms. Thomas refused to answer some questions, including various

22 hypotheticals, posed to her by opposing counsel.  Answering

23 hypothetical questions and testing assumptions and conclusions

24 are integral to the scientific process and the crux of expert

25 testimony.

1       But Ms. Thomas simply refused to allow Respondent's

2    counsel to test her methodology and reasoning.  She was also

3    combative with Petitioner's counsel, who was courteous and

4    professional throughout the deposition, and seemed personally

5    offended when counsel challenged the bases of her conclusions,

6    her reasoning and her knowledge of the basic psychological

7    constructs that she had applied.

8       I will also note that it's apparent Ms. Thomas at the

9    time was about to undergo surgery for breast cancer.  And she

10   clearly and justifiably had concerns about her own health and

11   well-being.  She was visibly agitated and anxious.  Given that,

12   I think some of this may be understandable, and it's necessary

13   to put it in context.  She clearly had a bad day.  We've all

14   had bad days, and, certainly, the Court is not going to draw

15   any additional conclusions about her clinical expertise based

16   on the fact that she fell short during this -- this one

17   deposition.

18       In short, Ms. Thomas's proposed expert testimony was

19   unhelpful to the Court.  Even if I did find that her testimony

20   was admissible under 702, either because I accepted Mr. Beers's

21   argument the rule doesn't apply to bench trial or because I --

22   I found that it met the threshold requirements of rule, I would

23   not still accord her purported opinions any weight.  At bottom,

24   I find that Ms. Thomas's testimony was largely based on

25   crediting AEN's account of sexual abuse as disclosed to her and

1    to others, and, as such, that she was essentially vouching for

2    AEN's truthfulness.  As a general rule, expert testimony that

3    does nothing more than vouch for the credibility of another

4    person encroaches on the fact finder's exclusive role to weigh

5    evidence and make credibility determinations and, therefore,

6    does not assist the trier of fact as required under Federal

7    Rule 702.

8            I further note that a key aspect of Ms. Thomas's

9    proffered expert opinion is that AEN would be at "grave risk

10   for further abuse or neglect" if the Court returns her to her

11   father's custody.  That opinion directly pertains to the

12   ultimate and overarching legal conclusion in this case, and it

13   impinges on the Court's authority to make that decision for

14   itself.

15           Even though the Court will strike and not consider

16   Ms. Thomas's opinions in its final analysis, it will, for the

17   reasons I have stated previously and throughout this

18   proceeding, admit and consider her testimony as a fact witness

19   to the extent Respondent designated her as such prior to trial.

20   Specifically, Ms. Thomas's testimony about AEN's statements to

21   her during their play therapy sessions about alleged sexual

22   abuse and the child's drawings depicting the same are

23   admissible under Federal Rule of Evidence 803(4) because they

24   were statements made or reasonably pertinent to medical

25   diagnosis or treatment.  The Court previously ruled that those

1    statements were admissible under the rule, and counsel has

2    conceded as much.

3           Even though the Court does not find that Ms. Thomas's

4    opinions about the child's statements to be relevant; that is,

5    helpful or reliable under 702, the Court notes that Ms. Thomas

6    has the education, background, training, and experience

7    necessary to provide play therapy.  And the Court makes no

8    adverse findings or conclusions about how she approached or

9    conducted AEN's therapy in this case.  Stated differently, just

10   because the Court will not consider Ms. Thomas's opinions based

11   on AEN's therapy does not suggest or imply that the Court has

12   any issue with the conduct of the underlying therapy, and,

13   relatedly, the admissibility of the statements the child made

14   to her therapist.

15          As Petitioner's rebuttal expert, Dr. Lane, noted --

16   and I am roughly paraphrasing this -- Ms. Thomas was acting as

17   a therapist, not as an evaluator.  Those are two different

18   hats.

19          The Court, in short, will consider what the child

20   said to Ms. Thomas, but it will not, for the reasons I have

21   just stated, credit or consider Ms. Thomas's opinions and

22   conclusions about the veracity about those statements.  The

23   motion in limine regarding Ms. Thomas's expert testimony is

24   therefore granted.

25          All right.  Having dealt with that issue, I think we